## BROMBERGER v. UNITED STATES.

(Circuit Court of Appeals, Second Circuit. January 25, 1904.)

No. 61.

1. POSTAL OFFENSES—LARCENY AND EMBEZZLEMENT FROM THE MAILS—INDICTMENT.

An indictment under Rev. St. U. S. § 5467 [U. S. Comp. St. 1901, p. 3691], contained two counts, the first charging that defendant did unlawfully and willfully secrete, embezzle, and destroy a certain letter intended to be conveyed by mail, which came into defendant's possession by virtue of his office and employment as a letter carrier, and which contained articles of value described, and the second charging that defendant did steal, take, and carry away such articles of value described therein. Held, that such counts were not repugnant to each other as charging both embezzlement and theft of the same article, the one being for the embezzlement of the letter and the other for stealing its valuable contents.

2. SAME.

A silver certificate issued by the United States is a "pecuniary obligation or security of the government," and "an article of value," within the meaning of Rev. St. U. S. § 5467 [U. S. Comp. St. 1901, p. 3691], and the secreting or destroying of a letter containing such a certificate, and the taking of such certificate from the letter, by a mail carrier, constitute embezzlement and larceny under said section.

3. SAME—DESCRIPTION OF CONTENTS OF LETTER.

An indictment under Rev. St. U. S. § 5467 [U. S. Comp. St. 1901, p. 3691], charging a mail carrier with embezzlement of a letter containing an article of value, and with stealing such article, is sufficiently specific where it describes the letter and describes the article contained therein as a silver certificate of the United States, giving its denomination, without setting out specifically the marks and numbers thereon.

4. CRIMINAL LAW—EXCLUSION OF EVIDENCE—HARMLESS ERROR.

On the trial of a mail carrier for embezzling a letter and stealing an inclosure there was evidence tending to show that two decoy letters, one of which was the one defendant was charged with taking, were by mistake placed in the pigeonhole of another carrier, who, when sorting his letters, said to defendant, "I have got two letters for your route, and I am going to misbox them," and added loud enough for defendant to hear, "These fellows must take me for Hanlon." Held, that the exclusion and striking out of evidence offered by defendant to show that Hanlon was a former carrier on defendant's route, who had been convicted through decoy letters addressed like the two intended for defendant, on the theory

that defendant, being so warned, would not have been likely,to take either of such letters, was without prejudice, even conceding that evidence of such collateral character was admissible, there being sufficient in the previous testimony to advise the jury in a general way who Hanlon was.

**5. POSTAL OFFENSES—EMBEZZLEMENT OF LETTERS—DECOY LETTERS.**

A letter properly stamped, with the receiving stamp of the office thereon, and placed in a carrier's pigeonhole at a postal station with other letters, addressed to a real person on his route, is "intended to be conveyed by mail," and its abstraction by the carrier and the taking of money therefrom constitutes on offense under Rev. St. U. S. § 5467 [U. S. Comp. St. 1901, p. 3691], although it was placed there by a postal inspector for the purpose of testing the carrier's honesty.

**6. CRIMINAL LAW—REFUSAL TO EXCLUDE WITNESS.**

The refusal of the court to exclude a witness during the trial of a criminal case is discretionary, and will only be reviewed for abuse of discretion.

**7. SAME—EVIDENCE.**

On the trial of a mail carrier for embezzling a letter and stealing a bill therefrom, the letter being one of two decoy letters bearing a printed address to the same person, a witness for the government testified that he placed both the decoy letters in defendant's pigeonhole, with others, for delivery. Another carrier, as a witness for defendant, testified that he found two letters so addressed in his own pigeonhole, and placed them in the "misbox." *Held* that, to prevent an inference by the jury that they were the decoy letters, and that the one embezzled may have been retained by the last witness, it was competent for the government to show in rebuttal by a clerk in the office that he found two such letters in the misbox, and redistributed them into defendant's pigeonhole.

Wallace, Circuit Judge, dissenting.

In Error to the Circuit Court of the United States for the Southern District of New York.

This cause comes here upon writ of error to review a judgment of the Circuit Court, Southern District of New York. The plaintiff in error was convicted, after trial, upon an indictment under section 5467, U. S. Rev. St. [U. S. Comp. St. 1901, p. 3691], for larceny and embezzlement from the mails. He was a letter carrier employed in the postal department at the city of New York. The facts sufficiently appear in the opinion.

Max J. Kohler, for plaintiff in error.

Clarence S. Haughton, for the United States.

Before WALLACE, LACOMBE, and COXE, Circuit Judges.

LACOMBE, Circuit Judge. The accused's route was known as "No. 21," and included the rectory of the Church of the Most Holy Redeemer. In order to make a test of the faithfulness of the carrier on that route, two post-office inspectors prepared two decoy letters. Each of them contained two $1 bills, of the variety known as "silver certificates," specially marked by the inspectors, and folded up in a double sheet of note paper, on which was written a request to be admitted to membership in some church society, and the statement that the money was for the same, signed with a fictitious name and address, the whole inclosed in an envelope, addressed "Rev. Father Rector,

¶ 5. See Post Office, vol. 40, Cent. Dig. § 61.

Church of the Most Holy Redeemer, 173 East Third Street, Bet. Avenues A and B, New York City." One of these decoy letters also bore the notice, "If not called for in ten days, return to Dora Lynch, 22 Myrtle Ave., Bridgeport, Conn." The address was printed, apparently indicating that the envelope was one of a number prepared by the church for distribution among persons from whom some return was expected, and the testimony indicated that the coming into Station D of similar printed envelopes for the rectory was a not infrequent occurrence. On October 8, 1902, the inspectors, having sealed both envelopes, put a stamp on each, and postmarked them "Bridgeport, Conn., and "Montgomery, N. Y.," respectively. They then gave them to Rothman, superintendent of Station D, where defendant was employed. Rothman gave them to his chief clerk, Brucher, who had the receiving stamp put on—what is called the "back stamp," showing the date of their arrival at the office—and who then deposited them in the carriers' separation cases. Rothman saw him stamp them, and saw him deposit them in the cases, "one in the first case and one in the second case." There were seven of these separation cases, each consisting of 22 pigeonholes, representing 22 routes. In each case the pigeonholes for the respective routes were similarly located, so that Bromberger's pigeonhole, 21, was next the pigeonhole of the carrier on route 22, one Kiechlin. These decoy letters were placed in the pigeonholes shortly before 12 o'clock. The several carriers for the 22 routes, according to usual routine, took the letters out of their respective pigeonholes (an operation known as "skinning"), making several trips to the cases for that purpose, and carried them to their desks, where they sorted and bunched the letters for their delivery trip. About 12:30 they left the station, and about an hour thereafter the accused delivered one of the letters (the one postmarked "Montgomery") at the correct address. Within a few minutes thereafter he purchased a paper of tobacco at a store No. 108 Avenue B, and paid for it out of a dollar bill. About an hour later, upon being questioned by the inspector about the undelivered letter, he disclaimed all knowledge of it; and shortly thereafter one of the marked bills, which had been enclosed in the missing letter, was found in the cash register of the store at which the accused had purchased the tobacco. None of the above-recited facts were in dispute upon the proofs.

The testimony left it doubtful whether the two letters were originally placed in the pigeonhole assigned to the accused or the adjoining one assigned to Kiechlin. Brucher testified with great positiveness that he put them in Bromberger's boxes. "I went there," said he, "with that intention, and am positive that I put one of those two letters in the box marked 21 in the first distributing case to the right, and the other in the box or pigeonhole marked 21 in the second distributing case to the right. * * * I am positive I did not put them in Kiechlin's box. There can't be any doubt about it." He further testified that from some convenient position he thereafter stood and uninterruptedly watched the boxes in which he had placed the letters for about 20 minutes, until he saw the accused come to the cases and "skin" those two boxes. On the other hand, Kiechlin

testified that about noon of the same day, just after he made a "skinning" of his boxes, and while he was sorting their contents at his desk, he found two letters similarly addressed in print to the Rev. Father Rector; that, seeing they were not for his route, he put them in the misbox case; that he said to the accused, "I have got two letters for your route, and I am going to misbox them;" and he remarked at about the same time, loud enough for accused to hear, "These fellows must take me for Hanlon," or "Here is a nice fat one for Hanlon." According to the usual course of the office, letters misboxed are immediately placed in the pigeonhole of the carrier for whom they are intended, and one of the clerks (Hoyler) testified that at about a quarter past 12 he found two letters similarly addressed in print to the Rev. Father Rector in the misbox case, and placed them in the pigeonhole of the accused. Inasmuch as the addresses on the decoy letters were printed, and similar printed addresses on letters for the rectory had been received at the station before, it is apparent that the identity of the two which were found in the misbox with the two decoys is not necessarily established by the evidence of Hoyler and Kiechlin. In the not improbable event that there were received at Station D on that forenoon two genuine printed rectory letters, the testimony of Brucher, Kiechlin, and Hoyler would be reconciled.

The accused testified that he received one letter only, the one he delivered at its address. He also introduced testimony to show that about 1 o'clock on the day in question a letter carrier other than himself, but who could not be identified, paid with a $1 bill for a purchase of tobacco at store No. 108 Avenue B, and that a number of letter carriers come to that store every day to make purchases. When the person in charge at the store, at the request of the inspector, searched in his cash register for and found the marked bill, there were other dollar bills in such register.

The evidence pointing to the conclusion that the accused received a letter which he did not deliver, and that he appropriated one of the dollar bills contained therein to the purchase of the tobacco within a couple of hours after receiving it, although circumstantial, fully warranted the verdict of the jury, and we find no force in the contention of plaintiff in error that the court should have advised the jury to acquit upon the theory that the evidence was insufficient to establish guilt.

Of the 23 assignments of error it will not be necessary to refer to any which were not relied upon in the brief and not discussed on the argument. The brief presents the usual contention that both counts of the indictment are bad because the subject-matter of the alleged larceny is not described in the language of the statute. Eliminating unnecessary clauses, the statute (Rev. St. U. S. § 5467 [U. S. Comp. St. 1001, p. 3691]) reads:

"Any person employed in any department of the postal service, who shall secrete, embezzle, or destroy any letter * * * intrusted to him, or which shall come into his possession, and which was intended to be conveyed by mail, or carried or delivered by any mail carrier, * * * and which shall contain any note, bond, draft, check, warrant, * * * certificate of stock, or other pecuniary obligation or security of the government, or of any officer

or fiscal agent thereof, of any description whatsoever, * * * or any other article of value, or writing representing the same; any such person who shall steal or take any of the things aforesaid out of any letter * * * which shall have come into his possession, either in the regular course of his official duties or in any other manner whatsoever, * * * shall be punishable by imprisonment at hard labor for not less than one year nor more than five years."

The indictment charges that the accused "being then and there employed in a department of the postal service, to wit, as a letter carrier attached to Station D," etc., "did unlawfully and willfully secrete, embezzle, and destroy a certain letter, which was intended to be conveyed by mail, the same letter having been intrusted to him and had come into his possession as such letter carrier by virtue of his said office and employment, and was then and there addressed and directed as follows: [setting it forth]. And the same letter then and there contained articles of value; that is to say, two silver certificates of the United States, each of the denomination and value of one dollar," etc. In a second count the indictment charges that the accused, being then and there employed, etc. (repeating the description given in the first count), "did unlawfully and feloniously steal, take. and carry away certain money, to wit, a silver certificate of the United States of the denomination and value of one dollar, the property of one William T. Mayer [the inspector who prepared the decoy letters], * * * from and out of a certain letter which then and there had come into his possession as such letter carrier, and by virtue of his said office and employment"—setting forth the address on the letter. The pleader has manifestly carefully conformed to the language of the statute. Cases are cited to the effect that bank notes are not the subjects of larceny at common law, and that under a federal statute of 1790 (Act April 30, 1790, 1 Stat. 114), making it a crime to take and carry away the "personal goods" of another, "bonds, bills, and notes, which are choses in action," cannot be held to be personal goods. All of which is interesting, but irrelevant. It is contended that the second part of the section "applies only to cases where postal clerks take valuable contents from mail matter which did not come lawfully in the first instance into their possession"— a most glaring misreading, for the language of the statute is, "either in the regular course of his official duties or in any other manner whatever." It is insisted that there is an irreconcilable repugnancy between the terms "theft" and "embezzlement"; that, therefore, both counts cannot stand, and that acquittal should have been directed on the second one; that the first count is itself defective because inconsistent .and repugnant in charging in the same count a destruction as well as an embezzlement and secretion of the same letter. Much argument is presented in support of these propositions and authorities are cited,, which, although they have no reference to the statute under consideration, abundantly show that courts have frequently gone to the extremest verge of casuistry in finding technical defects on which to reverse criminal convictions. See particularly U. S. v. Dow, Taney, 34, Fed. Cas. No. 14,990. The sufficient answer to all this, however, is that we are dealing not with the common law, but with a specific statute; that such statute provides for

two different things, viz., the letter or package which contains the valuable article and the valuable article which is contained in the letter or package. We must confess that we are wholly at a loss to understand why a person who embezzles a letter may not also secrete it till he reaches a convenient place, and may not then also destroy it; nor why he may not at the same time "take" from it whatever valuable contents it may inclose, nor why all these acts may not take place at substantially the same time and as part of the same transaction. Moreover, it seems to us that mere inspection of a United States silver certificate should be sufficient to satisfy any one that it is a "pecuniary obligation or security of the government," and certainly on October 8, 1902, it was an "article of value." The accused was in no way misled by the pleader in calling such certificate "money" in the second count, for the charge was specific that he took and carried away a silver certificate of the United States of the denomination and value of $1.

It is further contended that both counts are bad because "the marks, numbers, and particulars on the certificates * * * were not set forth." Of the numerous cases cited in support of this proposition, some have no application. See Moore v. U. S., 160 U. S. 268, 16 Sup. Ct. 294, 40 L. Ed. 422, where an indictment charging a postal clerk with embezzlement of $1,652 in money of the United States, the property of the United States, was held defective because it failed to aver that the same came into his possession in his capacity of postal clerk. Others support the contention, but are wholly unpersuasive. See U. S. v. Fisler, 4 Biss. 59, Fed. Cas. No. 15,105, where an indictment for forgery of United States postal currency was held bad because it did not set out an exact copy of the thing forged, although, after the averment that it was "in substance as follows," the actual forgery itself was pasted on the face of the indictment. Others again hold that the indictment is good if it contains a substantive description of the subject-matter, sufficient to inform the accused of what he was charged with taking, and to protect him from being again put in jeopardy for the same taking. Jones v. U. S. (C. C.) 27 Fed. 447. This seems to be the correct rule, and it is conformed to when the indictment gives the particular kind of obligation of the United States and the denomination of such obligation, coupled with a specific description of the letter in which it was inclosed. The suggestion that the jury may have supposed that some letter or letters other than the "Dora Lynch" one were what the grand jury intended to charge the defendant with embezzling is absurd.

Among the errors assigned are those to the rulings which led to the exclusion of the evidence offered by the accused to show who Hanlon, the person mentioned by the witness Kiechlin, was. The evidence was offered for the purpose of showing that Hanlon was a former letter carrier on the route of the accused, who had been convicted through decoy letters addressed like the two intended for the accused. It is contended that Kiechlin's remark suggested that the two letters placed by him in the misbox were decoy letters, such as had been used to entrap Hanlon; that, since it was made in the hearing of the accused, it was a remark likely to arouse his suspi-

cions also, and to put him on his guard against temptation, so that he would be unlikely to embezzle the letters, and more wary in disposing of their contents. Everything that was said in the presence of the accused prior to his starting out upon the occasion in question was admitted in evidence. The only bearing which Hanlon's identity could have upon the controversy was to furnish some support for the argument that the accused would not have embezzled letters to which his attention was called in so public a manner, under circumstances which might lead him to suppose he was being "tested" at the time. It may well be doubted whether, in any circumstances, matters so obviously collateral may be inquired into; but the majority of the court are satisfied that in the exclusion of the evidence offered as to Hanlon's identity there was no harmful error. The evidence of guilt was so convincing that the argument as to the accused's resisting the temptation because he was forewarned has little weight. It may equally well be argued that his knowledge that others knew from Kiechlin's statement that the latter had test letters in his hands might lead defendant to suppose that his chance was good to convert one of them and cast suspicion on his fellow employé. But it is not necessary thus to speculate. Hanlon's identity was sufficiently established to admit of the argument being made. The jury in fact knew who Hanlon was. In response to a question put by defendant's counsel, Kiechlin testified that Hanlon was "the man who was robbing the church on that route ahead of Bromberger." That answer was stricken out (it would perhaps have been wiser to have left it in), and, although the jury were not instructed to disregard it, we may assume that they understood they were to discharge their minds of it as completely as if they had not heard it. Possibly this is a violent assumption in a criminal trial, if the evidence thus stricken out is favorable to the accused, but the case must be decided as if it were not present in the jurors' minds. It did appear that Hanlon was the letter carrier who formerly had the defendant's route, and who was no longer in the service; that Kiechlin, after sorting what he had taken out of his boxes, said to the defendant that he had two letters for his (Bromberger's) route, and was going to "misbox" them (the defendant's story is that he said, "I have something for you for the church, and am going to misbox it"); that thereupon Kiechlin rose, and walked over towards the misbox, and on his way said in a voice loud enough for the clerks and for Bromberger to hear, "They are taking me for Hanlon;" that he (Kiechlin) thus "gave them all a hint that I wasn't taking any letters of that sort, of any kind," because, as he added, "I thought some one was trying me to see if I would keep those letters." Later he said there "wasn't anything suspicious about those letters," but it matters little what he really thought about them. His public announcement challenged the attention of Bromberger, to whom he had just said he had letters for route 21, which he was going to misbox; that there was something about them which induced him to proclaim aloud that he wasn't a Hanlon. It is difficult to understand how any intelligent juror, in the light of all the testimony, could have escaped the conviction that there was something about Hanlon's methods

that made a letter carrier solicitous to avoid repeating them, and that the defendant's attention was challenged to the fact that the letter or letters for his own route, formerly Hanlon's, which Kiechlin was then about to misbox, had something about them which induced Kiechlin thus loudly to proclaim the difference between himself and Hanlon. We utterly fail to see how any argument in favor of the defendant's innocence, or any suggestion that Kiechlin was the guilty party, could have been at all fortified by the retention in the record of the testimony which was stricken out.

It is contended that an acquittal should have been directed because the proof showed that the letter in question was not "intended to be conveyed by mail," but was a test letter, intended to be intercepted. This suggestion is wholly without merit. The letter, with the "back stamp" of the station on it, was placed in the carrier's pigeonhole with the other letters there placed for him to take, sort, and deliver to the proper addresses. The expectation that it might be intercepted by a dishonest carrier or clerk in no way destroyed its character when once regularly deposited in the mail, so stamped and addressed as to make it the duty of honest clerks and carriers to pass it forward to its destination. Section 5468 provides that the fact that any letter has been deposited in any post office or in any other authorized depository for mail matter shall be evidence that the same was "intended to be conveyed by mail" within the meaning of section 5467. The case cited, U. S. v. Hall (D. C.) 76 Fed. 566, does not apply. There the letter was addressed to a fictitious person at a fictitious address, and the officers who had placed it on the table where the accused clerk found it intended, if he did not take it, to themselves remove it from the mails, since "it could not be delivered to any such person at any such address."

It is further contended that the government failed to make out a case because it did not show that no two silver certificates bear the same number, and the brief states that the "bill in question is identified through its serial number alone." This, again, is a gross misstatement of the evidence. The post-office inspector who prepared the decoy letters testified that he copied the serial number and the date of each of the bills inclosed, and also made a private mark on each bill, viz., an ink dot on the letter O in the word "One" on the face of each bill. The other inspector corroborated him. The bill obtained from the store where the accused got the tobacco was produced on the trial, and the inspector testified that it was "one of the one-dollar bills that was placed in the letter postmarked 'Bridgeport.'" He didn't say how he identified it. No one asked him any such question on either direct or cross examination. Presumably such question was thought to be an idle one when the bill was present, and every one—counsel, witnesses, and jury—could tell from mere inspection whether the three earmarks, number, date, and ink dot, were collectively present. If they were, identity would seem to be established beyond any reasonable doubt.

At the opening of the cause counsel for the accused asked to have the witness Kiechlin excluded during the trial. The only ground assigned was that he was a hostile witness subpoenaed by the defense. This re-

quest was refused. Such refusal is discretionary with the trial judge, and will not be reviewed when no abuse of discretion is shown. See cases cited in 21 Encycl. Pleading & Practice, pp. 982–986. No such abuse is shown here. Certain errors assigned to the admission in evidence of the silver certificate, and of a copy of the contents of the missing letter may be disposed of in like manner. They deal with the order of proof only, and that is discretionary with the trial judge. The same may be said of the checking of defendant's counsel when upon his opening, after stating that the defense proposed to call among other witnesses one Kiechlin, who was a hostile witness, and that his hostility was evidenced by what took place regarding him before the commissioner, he was about to state in detail what did occur before the commissioner. Indeed, the matters referred to were of such doubtful relevancy that it might be expected that a careful trial judge would have kept them from the jury till it could be seen as the testimony developed whether there was any possible theory on which evidence of what took place regarding the witness before the commissioner could be admitted.

It is assigned as error that the court allowed the government, on rebuttal, to call Hoyler, and show by him that he found two printed "Rev. Father Rector" letters in the misbox, and placed them in the pigeonholes of the accused. The prima facie case, by the testimony of Brucher, traced the decoy letters direct from Bromberger's boxes to his hands. Then the defendant called Kiechlin to show that he found two similar printed letters in his boxes, and that he misboxed them. This made an apparent conflict with Brucher, and might have warranted the jury in finding that Brucher made a mistake by putting the decoys in box 22 instead of 21, and that Kiechlin, getting them out of that box, kept one and misboxed the other, which came to the accused, and was by him delivered. The prosecution was clearly entitled on rebuttal to show that somebody (the jury might infer it was Kiechlin) misboxed two printed envelopes. The circumstance that, when this evidence came in, there was an easy explanation harmonizing the testimony of Brucher, Kiechlin, and Hoyler on the theory that genuine printed rectory letters were in the station that day besides the decoys, did not warrant its exclusion.

The District Attorney, in his summing up, commented sharply on the attempt to show that Kiechlin was the guilty person, and on the possibility of two genuine letters having been made way with at the same time as the Bridgeport decoy. That did not necessarily follow, for, if the two rectory letters which Hoyler found in the misbox were genuine, they may not have reached the carriers' separation cases in time for Bromberger to get them before he started. The exceptions to refusal of the court to check counsel for the prosecution when summing up are without merit. Necessarily that part of the trial must be left largely to the discretion of the trial judge, and the above statement indicates that there was no abuse of discretion in this case.

Some additional assignments of error do not call for any extended discussion. It is sufficient to say that they are, in our opinion, unsound.

The judgment is affirmed.

WALLACE, Circuit Judge (dissenting). I agree with the majority of the court that the evidence upon the trial fully warranted the verdict of guilty. Nevertheless, the question of the defendant's guilt was one for the jury, and, if he was deprived of introducing evidence, however slight its value might be, tending to show the possibility of his innocence, his exceptions to the rulings should entitle him to a new trial. I think he should have been permitted to show that Hanlon, the person mentioned by the witness Kiechlin, was a former letter carrier on the route of the defendant, who had been convicted of embezzlement and of larceny through decoy letters addressed like the two intended for the defendant. Kiechlin's remarks suggested his suspicion that the two letters placed by him in the misbox were decoy letters, such as had been used to entrap Hanlon. They were made in the hearing of the defendant, and were likely to excite his suspicion also, and lead him to exercise unwonted caution to avoid being detected. The argument that, after his attention had been called to the character of the letters, he would be unlikely to embezzle them, or more wary in disposing of their contents, was one which could have been legitimately addressed to the jury; and, in view of the evidence introduced in his behalf tending to throw doubt upon his guilt, might have influenced their verdict. The exclusion of the evidence cannot be disregarded because the evidence may have been of trifling value. For this reason I think the defendant is entitled to a reversal of judgment and a new trial.