THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* GORDON COOKE and WINSTON A. SEALY, Appellants.

Argued November 23, 1943; decided March 2, 1944.

*Harry G. Anderson* for Gordon Cooke, appellant. I. The trial court committed reversible error in failing to answer a pertinent inquiry of the jurors relating to the necessity of intent to kill as an element of murder in the first degree. (Code Crim. Pro. § 427; *People* v. *Weiss,* 290 N. Y. 160; *People* v. *Flynn,* 290 N. Y. 220.) II. It was error for the trial court to deny a request of counsel for a sequestration of the witnesses. III. The verdict is against the weight of the evidence. (*People* v. *Paige,* 283 N. Y. 479.)

*Walter R. Hart* and *C. Joseph Danahy* for Winston A. Sealy, appellant. I. The verdict of murder in the first degree is against the weight of the evidence. (*Stokes* v. *People of the State of N. Y.,* 53 N. Y. 164; *People* v. *Hawkins,* 109 N. Y. 408; *People* v. *Guadagnino,* 233 N. Y. 344; *People* v. *Raffo,* 180 N. Y. 434; *People* v. *Fiorentino,* 197 N. Y. 560; *People* v. *Becker,* 210 N. Y. 247.) II. The trial court committed reversible errors of law in his charge to the jury. (*Stokes* v. *People of the State of N. Y.,* 53 N. Y. 164; *People* v. *Weiss,* 290 N. Y. 160; *People* v. *Flynn,* 290 N. Y. 220.)

*Thomas Cradock Hughes, Acting District Attorney* (*Henry J. Walsh* of counsel), for respondent. I. The trial court committed no error in its manner of complying with the jury's request for further instructions. (*People* v. *Raizen,* 211 App. Div. 446; *People* v. *Wansker,* 191 App. Div. 875; *Thomas* v. *People,* 67 N. Y. 218; *People* v. *Ferraro,* 161 N. Y. 365; *People* v. *Flynn,* 290 N. Y. 220; *People* v. *Johnson,* 185 N. Y. 219; *People* v. *Taylor,* 138 N. Y. 398; *People* v. *Koenig,* 180 N. Y. 155.) II. The defendants' guilt was proved beyond a reasonable doubt and they were accorded a fair trial. (*People* v. *Rimieri,* 180 N. Y. 163; *People* v. *Smith,* 180 N. Y. 125.)

DESMOND, J. About midnight on July 25, 1942, McKinley Kettles, seventeen years old, was stabbed to death by two young men on the stoop of Kettles' home on Gates Avenue in Brooklyn. On the stoop with Kettles when he received the two knife wounds were his mother, pleading for his life, and his sweetheart. Viewing the affray from a window were two visitors at the Kettles home. All four identified these two defendants as the stabbers. On the question of identity it was for the jury to

decide whether to believe the assertions of those four witnesses or the denials of the defendants. There was another question of fact as to intent to kill. The knifing came as the climax of a long, confused gang fight, or series of gang fights, which had raged through the neighboring streets for about two hours. The feud began when two youths quarreled over a girl. Fighting broke out between those youths and their adherents. Defendant Sealy, a partisan of one of the quarreling youths, was at that time cut in the face, perhaps accidentally, by Kettles, who had espoused the cause of the other. Sealy, who was about twenty years old at the time, then went with some of his friends to a nearby drug store where his cuts were bandaged. Sealy testified that he was not with the crowd of youths who later pursued Kettles and the latter's young woman friend to the Kettles home, and that he had nothing to do with Kettles' death. He admitted having a knife in his possession at some time during the evening but said he had given it to his (Sealy's) brother to take home. Defendant Cooke, about eighteen years old on the night of the killing, testified that he had been at the scene of the first encounter when Sealy was cut by Kettles' knife. Cooke told the jury that he had met Kettles again that evening, after the cutting of Sealy, had chided Kettles for fighting, had warned him of danger from a pursuing crowd that was even then in sight, and had urged Kettles to go home. When the pursuing crowd came close to Kettles, Kettles ran into a nearby police station for help and police officers dispersed the crowd. Defendant Cooke, according to his testimony, stood in a hallway until the police had sent the troublemakers away. The police station was on Gates Avenue about a quarter-mile from the Kettles home. Defendant Cooke testified that he then took a walk through nearby streets, finally arriving at the corner of Summer Street and Gates Avenue, some 500 feet from the scene of the killing. He insisted at the trial that he came no nearer than that to the Kettles home. However, he, like defendant Sealy, was positively identified, by the four eyewitnesses above mentioned, as one of the killers. Two of those witnesses swore that defendant Sealy, when Kettles' mother sought to protect her son, announced that he was going to kill Kettles. All four witnesses heard defendant Cooke, as he lunged at Kettles, tell Mrs. Kettles to get out of the way. We conclude

that there was enough before the jury to justify affirmative answers to the two important questions of fact submitted to them, that is, as to whether these defendants were the slayers and as to whether their intent was homicidal.

The principal question of law presented by this record arises from the County Judge's answer to, or failure to answer, a question from the jury. The jury's communication was handed up to the Judge after the jury had been deliberating for several hours. It read as follows:

" Your Honor: In your charge, did you state it was a point of law, that if a premeditated act to cause serious injury but not necessarily to cause actual death, but which, however, results in actual death, that this premeditated act is the intent to kill?

" We would appreciate your reading the parts of your charge dealing with ' intent ' relative to the act."

The Trial Judge, after reading it, told the jury that he did not understand the first part of the question but that the second part, or second paragraph, was so clear that he thought that if he should answer that second part, his answer would contain also the information asked for in the first part. We think the first paragraph or first question was clear enough, and that it plainly showed a desire on the part of the jurors, or some of them, to be further informed as to whether they were bound as matter of law to presume an intent to kill from the fact of an intentional stabbing, or whether the use of such a presumption was a matter of choice and judgment with the jury. Section 427 of the Code of Criminal Procedure requires that when, after jurors have begun their deliberations, they " desire to be informed of a point of law arising in the cause " the trial court *must* give " the information required ". In *People* v. *Flynn* (290 N. Y. 220) we reversed a conviction because the court refused, on due application by the jury and despite the urging of defense counsel, to give a categorical answer to a question not unlike the question propounded by the first part of the jury's query in the present case. It is not the law, however, that any failure by a court categorically to answer any question propounded by a jury must needs be reversible error. In each case we must decide whether there was serious prejudice to the defendant's rights. Our inquiry in the present case, therefore, is as to the

effect and meaning of the further instructions given by the Trial Judge when, though declining to answer the first question, he proceeded to answer the second, after expressing his belief that his answer to the second would give the jury all the desired information.

In his main charge the County Judge had charged, with fullness and clarity, as to deliberation, premeditation and intent. Discussing intent, he had told the jury that intent was " a mental function whereby a person aims or purports to attain the natural consequences of his act and like any other mental function it is a secret and silent operation of the mind, not visible to the human eye but which can be ascertained, however, from the actions and conduct of the individual whose intent is the subject of inquiry." Paraphrasing somewhat the language of Chief Judge RUGER in *People* v. *Conroy* (97 N. Y. 62, 77), the Trial Judge in his main charge had told this jury that a man is presumed to intend the natural and necessary consequences of his act and that unless the act has been done under circumstances precluding the existence of such an intent, a jury has the right to find from the results produced an intention to effect it. He had told the jurors that in deciding as to intent they might consider the circumstances leading up to the alleged assault, the motive if any, and the nature, number and location of the wounds inflicted on the body of the victim.

After that original charge and before the jury tendered the question above quoted, the jury had come in to the courtroom to have repeated to them the charge as to murder first degree and manslaughter first degree, " with particular emphasis ", requested the jury, on the word " intent ". In response the court redefined those crimes, repeating his earlier instructions as to intent.

When the Trial Judge, in response to the jury's double-barreled question, above quoted, again, and now for the third time, defined intent, he substantially repeated what he had said in his main charge and recharge, but made certain additions. Striking his desk with his gavel, the Court told the jury that the resulting noise was a natural consequence of the blow on the wooden desk and that there is a " presumption " that a person striking such a blow intends the noise. Then, elaborating on the idea that a man's actions may " belie his words ", the

court suggested, as an example thereof, a suppositious case of a man professing friendship for another but at the same time plunging a dagger into the other's heart. "The natural consequences of a man's act, who with a dagger sticks another man's heart, are that he wants to kill him, isn't that so?" the court said. He then went on to say that it is a well known fact that a puncture of the heart is fatal, so a knife blow to the heart justifies an assumption of an intent to kill. The court's illustrations were not too well chosen. As to the striking of the gavel on the wood, the noise that followed was a necessary consequence just as a wound, serious or slight, is an immediate and inevitable result of any cutting of the human body, but a gavel blow on a wooden surface may or may not have, besides the noise, another result also, such as damage to the wood. So an incision of the human body with a dagger, certain as it is to cause some wounding, may have a further and possibly unintended result, death. The other illustration used by the County Judge, that of the man professing friendship for another but plunging his dagger into the other's heart, was a little too apt since one of the actual knife wounds in Kettles' body (not the fatal wound) was at the left nipple, near the victim's heart. Conceding that the hypothetical situations, used by the court to illustrate his thrice-given definition and explanation of "intent", were not the happiest possible choices for that purpose, we cannot see that any serious harm was done. The use of such explanatory matter was not uncalled for, especially when the jurors, or some of them, showed their inability to understand clear and plain definitions. It would have been better to make the unequivocal statement that the jury was not bound to presume an intent to kill from the intentional stabbing (see *Stokes* v. *People of the State of N. Y.*, 53 N. Y. 164, 179; *People* v. *Weiss*, 290 N. Y. 160, 171) but the thrice-delivered charge in this case, on the question of intent, was not incorrect in substance or in any important part thereof.

We cannot allow to pass unnoticed the court's denial of the motion of appellant Sealy, made at the opening of the trial, for the exclusion of the witnesses from the courtroom. We have noticed such rulings in other criminal appeals recently argued before us. It is hard for us to understand what reason there is, or could be, for such a ruling, or why such a motion

should not be granted as of course, especially in a capital case. Wigmore (3rd ed. Vol. 6, ch. 63) says that the separation of witnesses is a matter of right like the right of cross-examination, but in New York it seems always to have been considered a matter of discretion. (*People* v. *Green*, 1 Park Cr. Cas. 11, 14; *Philpot* v. *Fifth Avenue Coach Co.*, 142 App. Div. 811.) Unlike some other states, New York has no statute on the subject (except Code Crim. Pro. § 202 dealing with certain proceedings before magistrates). We do not think that the court's refusal to '' put the witnesses · under the rule '' was reversible error in this case, but we repeat that we see no reason for such a ruling.

We have examined the supplemental record containing the proceedings on the. motion of appellant Cooke for a new trial on the ground of newly discovered evidence. We find no error in the denial of that motion.

The judgments of conviction should be affirmed.

LEHMAN, Ch. J. (dissenting). The defendants have been found guilty of killing McKinley Kettles from a deliberate and premeditated design to effect his death. On the night of the killing, Kettles, a youth of seventeen, was chased by a crowd of other youths and, in front of his home, some of them stabbed him and the wounds caused his death. The People produced evidence, which, though contradicted, the jury could accept as true, that Cooke, then eighteen years old, and Sealy, twenty years old, inflicted the wounds. Upon this appeal no sufficient ground is shown for disturbing the finding of the jury that the defendants were the slayers. Perhaps the most serious question to be decided upon this appeal is whether the charge of the Trial Judge adequately instructed the jury upon the question of intent to kill.

Judge DESMOND in his opinion has concisely stated the events' which led to the killing. Earlier in the evening Sealy's eye had been cut by a youth who did not belong to Sealy's '' crowd '' or '' gang ''. There is little doubt that Sealy's '' crowd '' resented the cutting as an indignity inflicted upon one of their own and were intent upon wiping out the indignity by inflicting injury, perhaps more serious, upon the assailant or upon an adherent of the assailant. The result was a

fight or series of fights between rival neighborhood gangs. The intent to inflict serious injury may reasonably be inferred from the manner in which Kettles was chased and brutally stabbed with knives. Intent to kill is an essential element of murder in the first degree; intent to inflict serious injury does not suffice. Though perhaps it cannot be said that as matter of law the evidence is insufficient to justify a finding of intent to kill, I find it difficult to believe that all the crowd who chased Kettles, or even the youths who actually inflicted the wounds, had such an intent. The attack was made with knives, not pistols. Death was the result of a wound in the armpit which severed the axillary artery. It took place on the public street in the presence of the mother and sweetheart of the victim. There was no attempt at concealment. Men who have formed a deliberate and premeditated design to kill do not, ordinarily, pursue their intent in such manner, and a cut with a knife in the armpit does not ordinarily cause death. In such circumstances it was very important that adequate instruction be given to assist the jurors in their consideration of the question whether the wounds were inflicted with intent *to effect death*.

Correct general instructions relating to deliberation, premeditation and intent, were, I agree, given by the Trial Judge in his main charge. True, he did not point out that an intent to inflict serious injury would not suffice, but he had charged that intent to kill was necessary and he was justified at that time in assuming that the jury would understand his instructions and apply them properly to the evidence, especially since he was not requested to amplify his instructions.

After the jury had deliberated several hours it requested that the stenographer read again "your Honor's charge to the jury defining Murder 1st degree and Manslaughter 1st degree". The foreman added: "Would you make it easy, Judge, with particular emphasis on the word 'intent' in both cases." In answer to the request the Trial Judge in effect reiterated to the jury his original charge relating to intent to kill as an element in the crime of murder, but apparently the trial court did not succeed in making it so "easy" that all could understand it, for later in the evening he received the communication quoted in the prevailing opinion.

I agree with my associates that "the first question was clear enough" and it cannot be disputed that the question whether "a premeditated act to cause serious injury but not necessarily to cause actual death, but which, however, results in actual death, * * * is the intent to kill" relates to a point of law which is decisive upon the issue whether these defendants are guilty of murder. The Code of Criminal Procedure, section 427, leaves to the trial court no discretion whether or not to give the information. The court *must* give the information requested, and where the court fails to give information requested upon a vital point no appellate court may disregard the error under section 542 of the Code of Criminal Procedure. Since intent to kill is an essential element in the crime of murder, and the question plainly showed that the jurors or some of them did not understand from the charge as previously given that intent to cause serious injury is *not* an intent to kill, it can certainly not be said that failure to give the information would not "affect the substantial rights" of the defendants. The only question which remains is whether the jury must have gleaned the required information from the charge as given, though the question was not answered unequivocally.

I concur in the conclusion that "it would have been better to make the unequivocal statement that the jury was not bound to presume an intent to kill from the intentional stabbing * * * but the thrice-delivered charge in this case, on the question of intent, was not incorrect in substance or in any important part thereof." The fact remains that *after* hearing the charge delivered twice the jurors asked further information. There is no reason to believe that delivery of the charge a third time removed any confusion or misunderstanding left after the charge had been delivered twice. At no place in that charge is there any statement, unequivocal or otherwise, that intent to inflict serious damage without intent to effect death is not the specific intent to kill which is an essential element of murder. True it is that the Judge read the statutory definition of murder and pointed out that design or intent *to effect death* is an essential element of that crime. Doubtless it follows logically that the killing of a human being with intent to cause serious injury but not to cause death would not con-

stitute murder as defined in the statute — yet the jury asked specifically whether it would satisfy the statutory definition, and nowhere is that question answered, directly or indirectly.

The illustrations used by the court for his thrice-given definition and explanation of " intent " are not only far from the " happiest possible choices for that purpose " but indeed suggest that the inference of intent to effect death arises whenever death results from a premeditated act to cause serious injury. It is indisputable that in reply to the question propounded by the jurors the Trial Judge gave no instruction which he had not given before and which might even by implication answer the question asked by the jury or remove the doubt which still remained in the minds of the jurors or some of them. That was error which this court may not disregard.

Judgment should be reversed and a new trial ordered.

LEWIS, CONWAY and THACHER, JJ., concur with DESMOND, J.; LEHMAN, Ch. J., dissents in opinion in which LOUGHRAN and RIPPEY, JJ., concur.

Judgments of conviction affirmed. (See 292 N. Y. 622.)