**UNITED STATES of America,**
**Appellee,**

v.

**Peter POSTMA and Joseph P. McConnon, Defendants-Appellants,**
**and**
**Nicholas Robilotto, Defendant.**
**No. 48, Docket 24114.**

United States Court of Appeals
Second Circuit.

Argued Nov. 16, 1956.

Decided Feb. 21, 1957.
On Rehearing April 9, 1957.

E. Stuart Jones, Troy, N. Y. (Segal, Dorsman, Soffer & Segal, Albany, N. Y., on the brief), for appellant Postma.

Isadore Katz, of Lieberman, Katz & Aronson, New York City, for appellant McConnon.

Richard E. Bolton, Asst. U. S. Atty., N. D. N. Y., Troy, N. Y. (Theodore F. Bowes, U. S. Atty., and Andrew J. Culick, Asst. U. S. Atty., N. D. N. Y., Amsterdam, N. Y., on the brief), for appellee.

Before CLARK, Chief Judge, and FRANK* and HINCKS, Circuit Judges.

HINCKS, Circuit Judge.

A one-count indictment was returned in April 1955, charging that Peter Postma, Joseph McConnon and Nicholas Robilotto, conspired from June 1951 to April 1955, when the indictment was returned, to interfere with interstate commerce by extorting money from eleven named truckers under threat of continuing a strike. The trial began in April 1956. Robilotto was acquitted by a directed verdict. The other two were found guilty and both appeal.

The Government's evidence showed that a union executive, the defendant Peter Postma, obtained $10,000 to his personal gain from a group of truck operators employing union drivers through threat of causing or continuing a drivers' strike. To carry the shakedown offer to the dealers and to collect the money demanded, Postma used as his go-between the codefendant, Joseph McConnon, manager of a firm engaged in the carriage of truck bodies by water and hence adversely affected by any strike stopping the movement of the trucks. Because of this interest, McConnon volunteered his services as go-between. Postma availed himself of McConnon's assistance but did not originally solicit it.

---

* Judge Frank, who participated in the decision of this appeal, died before the writing of this opinion. Although he left no draft of a dissenting opinion, he had indicated in an informal conference memorandum (1) a disposition to reverse on two points which are indicated in the body of this opinion and (2) a view that all other claims of error were without substance.

The Government presented among its witnesses nine members of the Highway Transport Association of Upstate New York, Inc., which group included many of the general freight haulers in the Albany area. It was shown that in 1951 when Peter Postma bargained for his union, Local 294, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, he accepted on its behalf a 13¢ per hour increase from the Association and terminated the bargaining session with a remark that "Next year when the contract expires in the fall, I will give you a proposal that you cannot accept and when you are out in the street, I will jam it down your throat."

In 1952, the bargaining for a new contract commenced with a demanded increase in wages and fringe benefits of approximately $1 per hour; a demand which the truckers viewed as exorbitant. Bargaining continued until Friday, November 7, 1952. At a meeting on that date, the truckers offered five "points," including a 10¢ hourly wage increase, each "point" being one of the categories in the package deal demanded by the union, and offered to bargain out the remaining two points. At this stage, when the truckers thought they were close to agreement, Postma unexpectedly refused the offer in a surly manner and departed after stating that the union demanded its original wage package which included a 44¢ hourly increase. That night the strike began.

Subsequent events may best be presented by excerpts from the direct testimony of John J. Vogel, Jr., president of a trucking firm and a member of the Truckers' Association. He testified that on the following Thursday, November 13, when he and another trucker were sitting in the Ten Eyck Hotel grill, in Albany, New York, McConnon came over to his table and said, "When are you going to get this strike over with?" Vogel replied that he did not know when the strike would end. McConnon left the table and then returned and requested Vogel to accompany him into the hallway for a private conversation. There McConnon said to Vogel, "If you will offer the seven points and ten thousand dollars, Pete [Postma] will settle the strike." Vogel's testimony continued: "When I heard that from McConnon, I was quite scared, and I was thinking about these operators signing these if and when contracts, and I was thinking that we certainly couldn't stay in business very long if we had to sign an 'if and when' contract."

By this reference to an "if and when" contract Vogel referred to those truckers who had agreed with the union, in return for their individual immunity from the strike, that they would accept the terms of the collective bargaining agreement if and when that should finally be reached. The greater the number of truckers who thus obtained immunity from the strike, the greater was the economic pressure on competing strikebound truckers to surrender to union demands believed to be exorbitant. Surrender to these demands, it was thought, would be ruinous. Yet, because of the competitive pressure from those who had signed the "if and when" contracts, continuation of the strike would also ruin the truckers holding out. It was the fear of economic destruction or injury created by these alternatives which led the truckers to accept Postma's offer to terminate the strike upon a collective bargaining agreement calling for a modest increase in labor costs (the seven points), sweetened by a cash payment to him. That, at least, was a permissible inference from the evidence.

Vogel returned to the restaurant table where he and his colleague discussed the offer and drafted a list of truckers and the amounts each might contribute towards the needed $10,000. Then they went to the Association's strike headquarters in the hotel and discussed the offer with those truckers who were present. The truckers agreed to accept the offer and Vogel went downstairs and so informed McConnon. On the next day, Friday, McConnon told Vogel the cash requirement had been upped to $30,000.

This the truckers refused to pay. On Saturday McConnon called Vogel and they met at the hotel. According to Vogel's testimony, McConnon said that Pete and they would take the ten thousand dollars, and that they wanted a small committee and a separate room. The room was obtained and Saturday afternoon a union committee of three met with Vogel and two other truckers, where, for two and a half or three hours they discussed Postma's trip to a union convention in California. Then Vogel walked to the other side of the room with Postma who said, "This town is very small and these operators will talk." Vogel said nothing. Postma then said, "Well, they are all getting theirs. I am going to get mine." After that they joined the group and Vogel asked if the "seven points" were acceptable. These included the 10¢ wage increase and the fringe benefits offered by the truckers before the strike began which then had been summarily refused by Postma. Without discussion Postma acceded. On the next day the trucks started rolling.

Thereafter, Vogel collected various sums from various truckers and paid $10,000 to McConnon in two installments. After the first installment, McConnon returned with a $500 bill and said that Postma wanted smaller bills in its stead. Vogel could not break it and suggested trying a bank. Later, in various conversations with Vogel, McConnon told him that all the money had been delivered to Postma.

■ Each defendant questions the sufficiency of the evidence to support his conviction. As we held in United States v. Masiello, 2 Cir., 235 F.2d 279, in the situation here presented, as to Postma and McConnon an absence of evidence sufficient to convict one will vitiate the conviction of the other. See also United States v. Austin-Bagley Corporation, 2 Cir., 31 F.2d 229.

We turn first to examine the evidence as to the guilt of McConnon. He did not testify or offer any evidence: as to him the case stands now as it did when the Government rested and McConnon moved for acquittal. See United States v. Calderon, 348 U.S. 160, footnote page 164, 75 S.Ct. 186, 99 L.Ed. 202. At that stage, there was evidence before the jury that McConnon, as manager of Trailerships Inc., for the first time cooperated with Postma after the strike had begun; that he did so at the behest of his employer whose business was adversely affected by the strike; and that McConnon before, during, and after the strike was on friendly terms with the truckers, who were his only customers. His claim, forcefully urged in his opening statement, throughout the trial, in summation and upon appeal is, to quote from his brief, "The evidence clearly established that McConnon did not join the alleged conspiracy but rather that he joined with the strike-bound employers, being an employer himself, to bring about a settlement of the strike by acting as the intermediary between Vogel, one of the struck employers, and Postma, the labor leader in charge of the strike." More simply, he claims that, being himself a victim of the strike, he could not and did not conspire to exploit the strike.

■■ We do not agree. McConnon intentionally and actively allied himself with Postma's effort to shake-down the truckers. Postma was activated by hope of personal gain and perhaps a desire to bring the drivers, whom he represented, back into gainful work. McConnon was activated by a desire for the gain that would result, at least to his employer, from an end of the strike. Any difference in their motives or in their relationship to the parties to the strike is without significance for present purposes. The crucial fact is that each knowingly cooperated in an effort to coerce the truckers, through fear of the economic consequences of a continuation of the strike, to pay Postma a sum of money for its termination. There was evidence enough to establish that fact and to support the verdict of guilt which rested thereon. See United States v. Brandenburgh, 2 Cir., 146 F.2d 878, 879.

The mere fact that a continuation of the strike directly or indirectly would work economic hardship, direct or indirect, on McConnon, did not justify his cooperation with Postma in committing an illegal act. R. I. Recreation Center v. Aetna Casualty & Surety Co., 1 Cir., 177 F.2d 603, 12 A.L.R.2d 230.

As to Postma the sufficiency of the evidence is even clearer. There was direct evidence which explicitly traced the fruits of the shakedown into his possession in addition to the proofs of his cooperation with McConnon in the conspiracy to extort. See United States v. Varlack, 2 Cir., 225 F.2d 665, 668. As to Postma also we conclude that the conviction was sufficiently proved.

■ On appeal, as below, the defendants urged that the Hobbs Act is unconstitutional or that in the alternative it must be so interpreted as not to apply to cases in which the only extortion was induced not by fear of force and violence but merely by threat of economic harm. These points have been raised before and have been consistently settled adversely to the appellants. United States v. Varlack, supra; United States v. Masiello, 2 Cir., supra; Bianchi v. United States, 8 Cir., 219 F.2d 182, certiorari denied 349 U.S. 915, 75 S.Ct. 604, 99 L.Ed. 1249; United States v. Dale, 7 Cir., 223 F.2d 181, and cases cited therein. On these points we reaffirm our holdings in Varlack and Masiello. United States v. Green, 350 U.S. 415, 76 S.Ct. 522, 100 L.Ed. 494, at most suggests that the Supreme Court has not yet dealt with the contentions of the appellants here.

■ Because twelve months lapsed between return of the indictment and commencement of the trial the appellants contend that the indictment should have been dismissed. In overruling this contention we do not rely upon the fact that neither defendant had seasonably demanded an earlier trial,[1] that the trial was at one stage continued two weeks at the defendants' request,[2] and that as to the merits the defendants were not shown to have suffered prejudice by the delay. We deny the motion on the ground relied on below, viz., that in view of the delay resulting from defendants' motions addressed to the complaint and the pressure of judicial business on the only available judges in the Northern District, the delay was not an unreasonable one. Compodonico v. United States, 9 Cir., 222 F.2d 310, 315, certiorari denied 350 U.S. 831, 76 S.Ct. 65, 100 L.Ed. 742.

■ The defendant McConnon moved for a severance on the ground that otherwise he would be prejudiced by evidence as to Postma's improper conduct. The motion was denied and rightly so, we hold. Prejudice was no more likely than in other cases of conspiracy. United States v. Varlack, supra; Robinson v. United States, 93 U.S.App.D.C. 347, 210 F.2d 29.

We come now to incidents in the course of the trial which are now charged to constitute reversible errors.

At the beginning of the trial, before any testimony was taken, Postma's counsel moved that all witnesses awaiting calls to testify should be excluded from the court room. After some colloquy[3]

---

1. Chinn v. United States, 4 Cir., 228 F.2d 151.

2. See United States v. Provoo, D.C., 17 F.R.D. 183, affirmed 350 U.S. 857, 76 S. Ct. 101, 100 L.Ed. 761.

3. At the start of the trial, the following colloquy took place between Postma's counsel and Judge Brennan:

"Mr. Segal: I move the court that all witnesses be excluded from the courtroom aside from such witness who is to testify.

"The Court: For what reason?

"Mr. Segal: Well, in the back of the courtroom there seems to be a large number of the individuals named in the indictment. Their testimony I assume will be repeated. I feel perhaps if just one witness is in the courtroom, we won't have a parroting of testimony.

"The Court: What was that last?

"Mr. Segal: Parroting.

"The Court: We don't follow that up here in this District very much. We do in narcotic cases, and unless there is some reason for it, and I have no reason to believe that the witnesses in this

this motion was denied and that ruling is now pressed as erroneous. The trial then proceeded: the Government offered as witnesses eight executives of corporate members of the trucking Association and its lawyer, all of whom testified at great length and in great detail to substantially the same effect without serious contradictions of one by another. Although it does not affirmatively appear that all these witnesses were in the court room and heard their predecessors testify, certainly there was no ruling to prevent such procedure and, giving the defendants the benefit of the doubt, we assume that that was just what happened.

 None the less, we hold that the ruling complained of was not erroneous.[4] By a long and unbroken line of federal cases[5] it is well established that the exclusion of witnesses is a matter for the sound discretion of the trial court. The same rule prevails, we believe, in a majority of state court jurisdictions. See, e. g., People v. Cooke, 292 N.Y. 185, 54 N.E.2d 357. Although in many cases the exclusion of witnesses is obviously desirable for such effect as it may have to prevent the perjurious parroting of testimony, we think it better to leave the decision to the judge than to adopt a rigid rule requiring exclusion of all

witnesses as a matter of right. Not infrequently justice may be better served, we think, by allowing witnesses to remain in the court room than by relegating them to the public corridors of the court house, where they will be exposed to the possible importunities and threats of hostile parties.[6] We do not overlook Wigmore's advocacy of the rule of exclusion as of right. 6 Wigmore, Evidence, Sec. 1839 [3rd Ed., Supp.1955]. Nevertheless, we adhere to the principle underlying the discretionary rule prevailing in the federal courts. And especially in view of the subject-matter of the claim of error next to be discussed (a news story relating to a threatened Government witness) we hold that no abuse of discretion has been shown. In Charles v. United States, 9 Cir., 215 F.2d 825, it was held that a refusal to exclude witnesses from the court room in pursuance of a settled practice was error, albeit harmless error, as involving a negation of the discretion resting on the trial judge under federal practice. In this case, we hold that no negation or abuse of discretionary power was shown even though the trial judge may not have spelled out all the considerations pertinent to his ruling.

The defendants further complain of prejudice allegedly resulting from news-

case will parrot testimony any more than in any other case. This is just an ordinary case. We will try it in the ordinary way. I will deny your request."

4. Judge Frank indicated an inclination to reverse because of this ruling.

5. Holder v. United States, 150 U.S. 91, 14 S.Ct. 10, 37 L.Ed. 1010; United States v. Chiarella, 2 Cir., 184 F.2d 903, remanded on another ground 341 U.S. 946, 71 S.Ct. 1004, 95 L.Ed. 1370; Bromberger v. United States, 2 Cir., 128 F. 346; Powel v. United States, 6 Cir., 208 F. 2d 618, certiorari denied 347 U.S. 961, 74 S.Ct. 710, 98 L.Ed. 1104; Kaufman v. United States, 6 Cir., 163 F.2d 404, certiorari denied 333 U.S. 857, 68 S.Ct. 726, 92 L.Ed. 1137; Tinkoff v. United States, 7 Cir., 86 F.2d 868, 879; Hood v. United States, 8 Cir., 23 F.2d 472; Witt v. United States, 9 Cir., 196 F.2d 285, cer-

tiorari denied 344 U.S. 827, 73 S.Ct. 28, 97 L.Ed. 644; Lii v. United States, 9 Cir., 198 F.2d 109; Mitchell v. United States, 10 Cir., 126 F.2d 550, certiorari denied 316 U.S. 702, 62 S.Ct. 1307, 86 L.Ed. 1771; Gates v. United States, 10 Cir., 122 F.2d 571, certiorari denied 314 U.S. 698, 62 S.Ct. 483, 86 L.Ed. 558; Oliver v. United States, 10 Cir., 121 F.2d 245, certiorari denied 314 U.S. 666, 62 S.Ct. 124, 86 L.Ed. 533; Reger v. United States, 10 Cir., 46 F.2d 38.

6. In his admonition to the jury at the beginning of the trial, before the motion to sequester witnesses had been made, Judge Brennan had said, "Now one other thing, in this courtroom, as in most of our upstate courthouses, the place is pretty crowded. We don't have any places for jurors, or lawyers, or witnesses, that is, no special place for them."

paper publicity at the time of trial. Six days after the trial began, they offered articles from local newspapers, published the day before, reciting that a potential witness for the Government had stabbed himself after receiving threats. They moved for a mistrial on the ground that the implications from such stories would seriously prejudice their right to a fair trial. The articles were not received in evidence but the tenor of their content is clear from the headlines which were read into the record in the absence of the jury: "Trucking Witness Stabs Self At Albany"; "Trial Witness Okay After Self Stabbing"; "Postma Case Witness Threatened Stabs Self." The trial attorney for the Government, before learning of the stabbing episode, had answered newspaper inquiries by saying that the person involved was a Government witness due to testify the following day. It was altogether clear that the publicity was not due to any misconduct on the part of the prosecuting officers. Even the defendants absolve them from blame but, claiming that prejudice was nevertheless sustained, moved for a mistrial.

Judge Brennan then examined the jurors and discovered that all but two of the regular panel and one alternate had read at least one article about the case on one of the days in question. He then inquired whether that material left any impression with the jurors as to the merits of the case. Being satisfied by their responses that none had been influenced thereby, the judge then admonished the jurors that their decisions must rest wholly on the evidence as received in the court room and said "keep your mind closed to everything outside the courtroom itself." During all of this, the subject-matter of the articles had not been mentioned in the hearing of the jury. The motion for mistrial was denied.

We think that this ruling was well within the range of discretion vested in the trial judge. United States v. Allied Stevedoring Corp., 2 Cir., 241 F.2d 925, decided February 4, 1957; United States v. Weber, 2 Cir., 197 F. 2d 237, certiorari denied with comment 344 U.S. 834, 73 S.Ct. 42, 97 L.Ed. 649; United States v. Leviton, 2 Cir., 193 F. 2d 848, certiorari denied with comment 343 U.S. 946, 72 S.Ct. 860, 96 L.Ed. 1350. The forceful admonition of the judge distinguishes the case here from Briggs v. United States, 6 Cir., 221 F.2d 636, in which no admonition at all comparable had been given. And here the publication was not caused by improper action of Government officers as in Shepherd v. State of Florida, 341 U.S. 50, 71 S.Ct. 549, 95 L.Ed. 740, and in Griffin v. United States, 3 Cir., 295 F. 437.

The last claim of error which we shall discuss was raised by the defendant Postma: it was covered by an exception to a portion of the charge included in a passage which we set forth in the margin.[7] The defendant argues that the use which the judge made of the scales

---

7. "Now, ladies and gentlemen, following that statement of those two rules, I think perhaps it would be logical if you would say to me, 'Well, how do I weigh evidence; how do I determine whether or not the evidence produced by the Government has established the violation charged in the indictment.'

"Ladies and gentlemen, there is no magical formula by which I can tell you what weight you will attach to any particular bit of evidence. But I can call your attention to several things which you may consider in determining the weight to be accorded to a particular bit of testimony, or to evidence, offered by the witnesses. What it means is evidence which to your understanding carries conviction, carries that weight to it which establishes in your mind the truth of a fact which is under discussion.

"The best way I can tell you how you actually weigh evidence is to imagine scales, and if you determine that the total of the evidence inclines the scales to the contention of the Government, then you would say, or attach to that evidence, you could say it was more weighty and it would be up to you to determine whether or not it is of the character that dispels in your mind any reasonable doubt.

"If, on the other hand, in weighing the evidence the scales are evenly balanced, or they incline to the defendant's contention, then you would say that the Government has not borne, carried the weight

metaphor indicated to the jury a modification of his earlier, correct, instructions as to the burden of proof and left it with the impression that a bare preponderance of the evidence would suffice to convict. Judge Frank, in his conference memorandum took that view.

■ In a criminal case, an instruction using the scales metaphor is seldom helpful and usually undesirable. However, in the context of the full charge given in this case we think no fatal misunderstanding resulted. To evaluate correctly this claim of error it must be borne in mind that the passage complained of immediately follows full and unexceptionable instructions as to reasonable doubt, the applicable burden of proof, and the presumption of innocence which was stated to continue "until you are satisfied in your review of the evidence that the guilt of either or both defendants have been established beyond a reasonable doubt." Against this preface we think it reasonably clear that the effect of the judge's comment on the weight of evidence and his use of the scales metaphor was to supplement, not modify, his instructions on the applicable burden of proof. This is suggested by his introductory statement that "following that statement of those two rules [i. e., reasonable doubt and presumption of innocence] * * * it would be *logical*" to discuss the weighing of evidence. The phraseology suggested that the statement of the "two rules" was complete in itself; that the task of weighing the evidence involved a different, subsidiary, concept. If the ensuing discussion were understood to contradict or modify the completed statement of the two rules, it would scarcely follow in "logical" sequence: in that event there would have been no *logic* in the prior meticulous discussion of the burden of proof and reasonable doubt. And, more important, after the introductory comment in the first paragraph in which the scales metaphor was suggested, it was said that if the evidence in favor of the Government

preponderates or is "more weighty," then "it would be up to you to determine whether or not it is of the character that dispels in your mind *any reasonable doubt.*" Surely this gave the impression that to convict it was necessary that the Government's evidence not only should be "more weighty" but also that it must satisfy every reasonable doubt. In contrast with this is the next and final paragraph quoted in the margin, in which it was observed that if the scales were in balance or inclined to the defendant's contention, the Government has not "carried the weight of evidence." In this, we discern no reasonably possible implication that the Government might be found to have established its case beyond a reasonable doubt when it failed even to sustain the weight of evidence.

All other claims of error which have been pressed we think so lacking in substance as not to require discussion.

Affirmed.

Before CLARK, Chief Judge, and HINCKS, Circuit Judge.

## On Petitions for Rehearing

PER CURIAM.

Each of the appellants, whose convictions were affirmed by our opinion, petitions for rehearing.

### McConnon's Petition

■ It is now contended that we overlooked McConnon's claim of a fatal variance between the conspiracy charged, which was alleged to have begun on or about June, 1951, and that which the jury found to have been formed when McConnon and Postma began their collaboration in November, 1952. It is true that we did not discuss this contention in our original decision: we thought it too specious to need discussion. For the indictment charged a conspiracy between Postma, Robilotto, and McConnon "to obstruct, delay and affect interstate commerce * * * by

of evidence as to the particular item of evidence under consideration, or as to the

case as a whole, if you are considering the case as a whole."

extorting from" 12 named members of the trucking industry. It is true that there was insufficient proof to hold Robilotto and as a result the conspiracy charged was not proved to have existence until McConnon and Postma began to cooperate in a plan involving extortion. But because the indictment charged a three-man conspiracy existing between 1951 up to the date of the indictment and the proofs went no further than to show that of the three charged only two were criminally involved in a conspiracy not perfected until 1952, it does not follow that there was a fatal variance: the conspiracy proved fell within the period charged. And a conspiracy to interfere with interstate commerce by extorting money "under threat of continuing a strike" is precisely the conspiracy charged in paragraph 1 of the indictment which named McConnon, along with Postma and Robilotto, as a conspirator.

 Nor may McConnon justly complain that he suffered undue prejudice from evidence relating to Postma's declarations and activities prior to the consummation of their joint conspiracy, as proved. Although that evidence was offered primarily in an effort (which turned out to be unsuccessful) to prove the existence of a conspiracy between Postma and others before McConnon came into the scene, it was also admissible as tending to show that Postma, at and prior to the time when his collaboration with McConnon began, was nourishing illegal designs against interstate commerce of which McConnon was aware. Heike v. United States, 227 U.S. 131, 145, 33 S.Ct. 226, 57 L.Ed. 450; United States v. Compagna, 2 Cir., 146 F.2d 524, 530, certiorari denied 324 U.S. 867, 65 S.Ct. 912, 89 L.Ed. 1422

McConnon, in an effort to support sundry other attacks on the validity of his conviction, cites Pereira v. United States, 347 U.S. 1, 11, 74 S.Ct. 358, 98 L.Ed. 435; People v. Scheppa, 295 N.Y. 359, 67 N.E.2d 581; and Hornstein v. Paramount Pictures, 292 N.Y. 468, 55 N.E.2d 740. In view of the evidence and

the charge in this case, it seems to us abundantly plain that none of the cases cited demonstrates any of the errors which McConnon thinks inherent in his conviction.

### Postma's Petition

This petition raises only contentions which we think were adequately discussed and dealt with in our original opinion.

### Conclusion

 The petitions are both denied on the merits. However, in view of McConnon's expressed intention to apply for certiorari, our mandate as to both appellants will be stayed pending a timely application for certiorari and, if such be granted, until finally dispositive action by the Supreme Court. Meanwhile, as to each, bail may be continued.