## COURT OF APPEALS.
### June 14, 1907.

## THE PEOPLE *v.* WILLIAM NELSON.

(189 N. Y. 137.)

MURDER—SUFFICIENCY OF EVIDENCE.

> The proceedings and evidence upon the trial of a defendant indicted for murder examined and held that the defendant had a fair and impartial trial and that the evidence was sufficient to sustain and justify a verdict of murder in the first degree.

APPEAL from a judgment of the Supreme Court, rendered April 9, 1906, at a Trial Term for the county of New York, upon a verdict convicting the defendant of the crime of murder in the first degree.

The facts, so far as material, are stated in the opinion.

*John D. Lindsay* for appellant. The defendant did not have a fair legal trial. (*People* v. *Davey,* 179 N. Y. 345; *People* v. *Greenwall,* 115 N. Y. 520; *People* v. *Fielding,* 158 N. Y. 542; *Carlson* v. *Winterson,* 147 N. Y. 652; *Gardner* v. *Bartholomew,* 40 Barb. 325; *Sims* v. *Sims,* 12 Hun, 231; *People* v. *Dorthy,* 156 N. Y. 237; *People* v. *Crapo,* 76 N. Y. 288; *People* v. *Cascone,* 185 N. Y. 317; *Coleman* v. *People,* 55 N. Y. 81; *People* v. *Shea,* 147 N. Y. 78.)

*William Travers Jerome,* District Attorney (*Robert C. Taylor* of counsel), for respondent. The defendant had a fair trial and no valid reason can be discovered for the reversal of the judgment. (*People* v. *Sliney,* 137 N. Y. 571; *People* v. *Rodowald,* 177 N. Y. 408; *People* v. *Tobin,* 176 N. Y. 278; *People* v. *Breen,* 181 N. Y. 493; *People* v. *Willson,* 109 N. Y. 345; *People* v. *White,* 176 N. Y. 331; *People* v. *Patrick,* 182 N. Y. 131; *People* v. *Rimieri,* 180 N. Y. 163.)

CHASE, J.   About ten o'clock in the evening of December 29th, 1905, one Lizzie Norman was killed.   Her throat was so severely cut as nearly to sever her head from her body. The defendant was charged with the homicide and he has been indicted for and convicted of the crime.   From the judgment entered upon the conviction he appeals to this court.   The questions raised on the appeal do not require more than a general statement of the facts upon which the defendant was convicted.

The evidence taken upon the trial warranted the jury in finding that the defendant met the deceased in August, 1905, and that they immediately commenced living together in a rear apartment in a building at 149 West 51st street, borough of Manhattan, New York.   With them in the apartment lived one Lottie Arnold.   Two other apartments on the same floor were also occupied by tenants.   The defendant, the deceased and all of the occupants of rooms on the floor of the building mentioned were ignorant colored people.   The deceased was a laundress, and did her work in the apartment.   About six o'clock in the evening of the homicide the defendant returned to the apartment from his work, and found Lizzie Norman engaged in ironing, and Lottie Arnold in preparing the evening meal.   The three partook of the meal, after which one Rice, a friend of Lottie Arnold, came in and the women continued with their work, while the men conversed until about nine o'clock, at which time Lottie Arnold and Rice left the apartment and went to the street. Soon thereafter the defendant went down the stairs from the floor upon which he lived, but he returned before ten o'clock. After he returned the other tenants heard loud talking and struggling in his apartment.   Lizzie Norman was seen to open the door leading from the kitchen into the hallway and rush toward the staircase, or the door of the middle apartment, but the defendant reached from the door of his apartment and grabbed her and pulled her back into the kitchen and threw her upon the floor, and he then closed the door of his apartment with a slam.

She was heard to exclaim, " Please, Mr. Nelson, don't kill me; " and she also screamed " Murder " twice. Soon after the door was closed the noise ceased, and some one from within then locked the door to the apartment and fastened the transom. Lottie Arnold returned at half-past ten o'clock, and as the key to the locked door was in the lock she was unable to open the door and enter the room. By standing upon a chair she looked through a hole in the partition between the defendant's apart- ment and the hallway and saw the defendant lying face down upon a bed. She called to him to open the door. He moved slightly and muttered, but did not respond to her request. She was told of the struggle that had occurred in the rooms, and a police officer was sent for, who came and broke open the door and found the body of the deceased lying on the floor of the kitchen, with her throat cut as stated, and an open, bloody razor lying on the floor near her body. The defendant did not respond to the officer's efforts to arouse him. He was apparently uncon- scious, and the officer took him from the bed and laid him upon the floor of the kitchen a short distance from the body of the deceased. An ambulance physician spoke to the defendant, and as he did not respond he felt of his pulse, which he found to be normal. He opened defendant's eyelids and passed his finger over his eyeballs to which he did not respond. He then inserted the tube of a stomach pump into his nostrils and the defendant then shook his head and pushed the tube away with his hand. The physician testified that the defendant appeared to be in a drunken stupor, but as his services did not seem to be further required he left the house. Other police officers arrived and they tried to arouse the defendant without success. Within two or five minutes after the physician left, the defendant sud- denly and voluntarily sat up on the floor with his back to the deceased and said, " If I have done anything wrong to my girl, shoot me dead." He was then taken to the station house. At the station house he said in the presence of the coroner and

others, " It is no use denying it, put me in the chair, make it short." The coroner said, " This man ought to be warned of his rights because anything he says here now may be used against him." The defendant continued to repeat, " I did it, there is no use denying it, put me in the chair, make it short." When the officers first saw the defendant in the rooms there was blood upon his shirt and under his finger nails, and a cuspidor in the room was filled with water mixed with blood, from which it is argued that the defendant washed his hands therein after the homicide was committed. At the station house the following morning blisters were found on the defendant's right hand and he was asked what caused them, to which he replied that he had a quarrel with the deceased on the night previous and that she threw a hot iron at him.

The defendant took the stand in his own behalf and testified that Rice lived there in the apartment with Lottie Arnold, and that on the night of the homicide the four had their meal together and after the meal Rice asked him to go down town with him to see a friend. He says that he and Rice left the apartment about seven o'clock and went down town and into different saloons where they drank freely, after which they returned to the apartment together about half-past nine o'clock and found the two women in the room. He describes what occurred in the apartment on his return as follows: " I sit down. I feel myself flighty. When I sit down in the chair I got flighty, that is, just as though I was going to faint after I sit down, and I felt myself slipping away. And in the meantime, before I got sound, I felt some one—I don't know whether it was a towel or handkerchief—but they wiped me twice over the face, and it smells like some kind of perfume; and at that time it seemed as if I tried to speak, but couldn't do anything, and just completely got away. And that is all that I know. And never was I in such a condition before in my life. I was naturally limbless."

He denies that he killed the deceased or that he has any knowledge regarding the homicide. No witnesses were called on behalf of the defendant except his last employer who testified in response to a question as to the reputation of the defendant for peace and quietness.

The verdict of the jury was not only warranted by the evidence but the conclusion that the defendant deliberately and intentionally cut Lizzie Norman's throat after she had tried to escape from him and while she begged of him not to kill her is irresistible. The jury properly refused to believe the defendant's story to the effect that by reason of his drunkenness or by drugs administered to him by others he became unconscious and remained so while some person or persons other than himself committed the homicide.

There is not an exception in the record other than to the denial by the court of a motion to direct the jury to acquit the defendant and to the denial of other motions of a similar general character. The counsel assigned to aid the defendant in this court urges that although there are no exceptions in the record to rulings of the court relating to the evidence or to the charge of the court, that the defendant was nevertheless prejudiced by the general conduct of the trial in a way which requires that a new trial should be granted in the interests of justice.

When the judgment is of death this court may order a new trial if it be satisfied that the verdict was against the weight of evidence, or against law or that justice requires a new trial whether any exception shall have been taken or not in the court below. (Code Criminal Procedure, section 528.)

The verdict in this case was not against the weight of evidence. The record does not disclose an error of law and we have carefully examined every claim made by the learned counsel for the defendant to show that injustice was done the defendant on the trial and in the conduct thereof, but without going into a

detailed statement of such claims it is sufficient to state that in our judgment the defendant had a fair trial, and that justice does not require any interference with the result thereof by this court.

The judgment of conviction should be affirmed.

O'BRIEN, EDWARD T. BARTLETT, HAIGHT, WERNER and HISCOCK, JJ., concur; CULLEN, Ch. J., absent.

Judgment of conviction affirmed.