THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* ANTONIO GEZZO, Appellant.

Argued June 2, 1954; decided July 14, 1954.

*James T. Viger* for appellant. I. The court's refusal to allow counsel for defendant to examine notes purportedly made by Inspector Sayers, a witness for the prosecution, of a conversation between Sayers and defendant on the day of the alleged crime, which notes were used by Sayers on the witness stand to refresh his recollection, constituted reversible error and a denial by the trial court of defendant's right to effectively cross-examine the witness, Sayers. (*Tibbetts* v. *Sternberg,* 66 Barb. 201; *Schwickert* v. *Levin,* 76 App. Div. 373; *Richardson* v. *Nassau Elec. R. R. Co.,* 190 App. Div. 559; *Miller* v. *Greenwald Petticoat Co.,* 192 App. Div. 559; *Morris* v. *United States,* 149 F. 123.) II. The failure of the trial court Judge to answer one question proposed by the jury in the course of their deliberation and the trial court Judge's failure to properly answer a second question so proposed constitutes reversible error. (*People* v. *Cooke,* 292 N. Y. 185; *People* v. *Gonzalez,* 293 N. Y. 259.) III. The order of the trial court Judge that counsel for defendant was, under no circumstances, to speak or register an exception to the court's answer to questions submitted by the jury during the course of its deliberation, constituted a deprivation by the court of defendant's right to counsel and, also, his right to a fair trial and was reversible error. (*People* v. *Hull,* 251 App. Div. 40; *Maurer* v. *People,* 43 N. Y. 1; *Gangi* v. *Fradus,* 227 N. Y. 452; *People* v. *Parisi,* 276 N. Y. 97.) IV. The verdict of the jury was and is clearly contrary to the weight of the creditable evidence. (*People* v. *Guadagnino,* 233 N. Y. 344; *People* v. *Pignataro,* 263 N. Y. 229; *People* v. *Carbone,* 156 N. Y. 413; *People* v. *Peller,* 291 N. Y. 438.)

*Timothy F. O'Brien, District Attorney* (*John T. Casey* of counsel), for respondent. I. The court's refusal to allow the defense to examine notes used by a prosecution witness on his direct examination did not constitute reversible error. (*People*

v. *De Simone,* 181 App. Div. 840; *People* v. *Miller,* 257 N. Y. 54; *People* v. *Campiglia,* 258 App. Div. 916; *People* v. *Buchalter,* 289 N. Y. 181; *People* v. *Ferraro,* 293 N. Y. 51; *People* v. *Laudiero,* 192 N. Y. 304; *People* v. *Barnes,* 202 N. Y. 77; *People* v. *Kiernan,* 101 N. Y. 618.) II. The court's instructions to the jury on the question submitted were in all respects proper. (*People* v. *Cooke,* 292 N. Y. 185.) III. The affidavit of a juror, mentioning his mistaken concept of the law in regard to premeditation and deliberation, cannot be considered on this appeal to show his confusion on premeditation and deliberation. (*People* v. *Sprague,* 217 N. Y. 373; *People* v. *Gonzalez,* 293 N. Y. 259; *People* v. *Cooke,* 292 N. Y. 185.) IV. The order of the trial court that neither the District Attorney nor counsel for the defense was to speak in the presence of the jury upon its return to court for further instructions, was not reversible error. (*People* v. *Fiorentino,* 197 N. Y. 560; *People* v. *Turley,* 153 App. Div. 671.) V. The verdict of the jury is sustained by the weight of the evidence. (*People* v. *Schmidt,* 168 N. Y. 568; *People* v. *Fish,* 125 N. Y. 136; *People* v. *Seidenshner,* 210 N. Y. 341; *People* v. *Sanducci,* 195 N. Y. 361; *People* v. *Filippelli,* 173 N. Y. 509; *People* v. *Decker,* 157 N. Y. 186; *People* v. *Chapman,* 224 N. Y. 463.)

Conway, J. On December 25, 1952, at about 3:00 p.m., Mrs. Mary Frank was shot and killed and one Stephen Spotten was wounded at the home of Mrs. Frank in the hamlet of Speigletown, Rensselaer County. It is admitted that defendant fired the shots and that he then shot himself in the head in an attempt at suicide.

On January 29, 1953, defendant was indicted on two separate indictments, the first of which charged him with the crime of murder in the first degree, for the murder of Mrs. Frank, and the second of which charged him with the crime of attempted murder in the first degree, for the crime committed on the person of Stephen Spotten. Defendant was tried under both indictments at the same time.

After deliberating for nearly seven hours the jury rendered a verdict against defendant convicting him of the crime of murder in the first degree on the first indictment and attempted murder in the second degree on the second. An appeal to the Appellate

Division, Third Department, is presently pending from the latter conviction. We are here concerned with the conviction of the crime of murder in the first degree only.

Testimony on the People's case was to the effect that defendant — a seventy-year-old laborer, married and the father of fifteen children — who had been keeping company with the deceased — a married woman of approximately forty years of age and the mother of three children — went to her home on December 25, 1952, at about 1:30 P.M. to visit her. While there he saw Stephen Spotten and the deceased and argued with Mrs. Frank over Spotten's presence. He then left the house having threatened Mrs. Frank. Defendant returned to the Frank home at about 2:55 P.M. on the same day with a revolver, entered the house, shot and killed Mary Frank and wounded Stephen Spotten. Spotten testified that the shooting was unprovoked.

The defendant, who took the stand in his own behalf, maintained that, when he arrived at the Frank home on the first occasion, Stephen Spotten, who had spent the night of December 24th at the Frank home, said to him: " Get out before I kill you "; that thereupon the defendant asked the deceased to call a taxicab for him, so that he might return to Troy, New York. When the taxicab came, he returned to his home in Troy and lunched with his family. He then went to a bar and grill in Troy where he was called to the telephone. He testified that it was the deceased who telephoned him and that she demanded that he return to her home in Speigletown. Defendant did return and, according to him, when he entered the house and reached the kitchen, he was accosted by Stephen Spotten. He testified that Spotten seized a knife from the table and, holding it up, advanced toward him, stating, " I am going to stab you ". The defendant further testified that he then drew a revolver, which he had procured at the time he returned to his home earlier in the day, and discharged it four times at Spotten. Two of the bullets struck Mary Frank causing her death.

Upon this appeal, defendant contends that the trial court committed reversible error: (1) in refusing to allow defense counsel to examine notes purportedly made by one Inspector Sayers, a witness for the prosecution, of a conversation between Sayers and defendant on the day of the alleged crime, which notes were used by Sayers on the witness stand to refresh his recollection;

(2) in failing to answer one question propounded by the jury in the course of its deliberations and in failing to properly answer a second question so propounded, and (3) in ordering defense counsel under no circumstances to speak or register an exception to the court's answer to the questions submitted by the jury during the course of its deliberations. The prosecution maintains: (a) that while the trial court erred in refusing to allow defense counsel to examine the memorandum used by Sayers to refresh his recollection, such error did not materially prejudice defendant's case; (b) that the court properly instructed the jury in the course of its deliberations, and (c) that the order of the trial court that neither the District Attorney nor counsel for the defense speak in the presence of the jury upon its return to the courtroom for further instructions, was not reversible error.

Sometime shortly after the shooting, defendant was admitted to a hospital in a critical condition and in a state of shock as the result of a self-inflicted gunshot wound in his head. At about 4:50 P.M. on that afternoon, Inspector Sayers of the New York State Police arrived at the hospital to interview defendant. A captain of the New York State Police, two State troopers, an assistant district attorney, and a coroner were present, apparently during the entire period of questioning, and a doctor and a priest were present during part of the time. A nurse who was attending defendant was also in and out of the room during the questioning. Sayers testified that during the questioning defendant was conscious, rational and able to answer questions. Sayers had no independent recollection of the questions asked by him or of the answers given by defendant in response to his questions but stated that he had made a memorandum of the interview. The District Attorney asked that the witness be allowed to refresh his recollection by resort to the memorandum. The court granted that request. Defendant's counsel requested permission to inspect the memorandum. Such request was denied. The District Attorney opposed the demand of defendant's counsel to be permitted to examine the notes and stated that he was not offering the memorandum in evidence but merely wished to use it to refresh the recollection of the witness.

The witness then proceeded to testify to the interview, apparently reading verbatim from the memorandum, for his testimony is in question and answer form. The substance of Inspector

Sayers' interview with defendant, as testified to by Sayers, was that defendant admitted that he went to the Frank home with the preconceived intention of killing Mary Frank and that he carried the plan into effect.

The inspector admitted that he had made '' further notation '' on the memorandum after leaving defendant's room at the hospital. He further admitted that no stenographic record of the conversation between himself and defendant was made; that he did not read the memorandum back to defendant or ask him to sign it.

The nurse who had been attending defendant was called as a witness by the People. She apparently did not concern herself with the questioning and did not testify as to the conversation had between Inspector Sayers and defendant. She testified merely to having observed a man taking notes while the questioning was going on at which time she said defendant was conscious and not in shock.

The coroner and two State troopers who were present in the room were called to the stand by the People but were not questioned concerning the interview between Sayers and the defendant. Neither the captain of the State Police, the assistant district attorney, the doctor nor the priest, all of whom were in the room either all or part of the time while defendant was being interrogated, was called as a witness to corroborate Sayers' testimony.

The memorandum used by Sayers in refreshing his recollection was never marked for identification.

Sayers further testified in answer to questions by the District Attorney that on December 27th, or two days later, he returned to the hospital in the company of an assistant district attorney and a stenographer and procured a second statement from defendant. This second statement taken down by the stenographer differed from the first one in that defendant maintained that Stephen Spotten held a knife in his hand at the time the shooting occurred.

The defense subpœnaed the stenographer and his notes. The second statement given by defendant was read into the record by the stenographer. In it defendant declared that, when Spotten threw the knife at him (defense counsel asserts that defendant meant that Spotten lunged at him with the knife

but, because of his poor command of the English language, improperly said that Spotten threw the knife at him), he discharged the revolver and both Mary Frank and Spotten were struck with the bullets. He denied that he had any intention of killing Mary Frank when he returned to the house the second time or that he so informed Inspector Sayers when he was first brought into the hospital. He explained that he went to the house armed because "maybe they had a gun in the house. How would I know? They had a knife, I know that".

When defendant took the stand in his own behalf, he denied that he intended to kill deceased. He testified that, when Spotten came at him with a knife in his hand, he shot her accidentally.

It is conceded by the District Attorney that the trial court's ruling on defense counsel's request to inspect the memorandum used by Inspector Sayers to refresh his recollection was error (see *Tibbetts* v. *Sternberg*, 66 Barb. 201; *Schwickert* v. *Levin.* 76 App. Div. 373; *Richardson* v. *Nassau Elec. R. R. Co..* 190 App. Div. 529). However, he contends that it was an error which did not materially prejudice defendant's case because quite apart from Sayers' testimony the record contains evidence that the killing of Mary Frank by defendant was done with a premeditated and deliberate design to effect her death. Thus, he points (1) to the testimony of Spotten and of the deceased's children that, when defendant first left the house, he threatened deceased, (2) to the fact that defendant armed himself with a loaded revolver before returning to the house, and (3) to the testimony of Spotten that defendant shot deceased and himself without provocation.

We cannot agree that the conceded error was thereby rendered harmless and insubstantial or that it may, by reason of this additional evidence of a premeditated and deliberate design to effect deceased's death, be characterized as a nonprejudicial error.

Defendant conceded that he had shot both deceased and Spotten. The sole issue was whether he did so in self-defense, or, if not in self-defense, whether he did so with a premeditated and deliberate design to effect the death of Mrs. Frank. The evidence on those issues is in sharp conflict, and we cannot, with any degree of certainty, say that Sayers' testimony (which

was uncorroborated by any of the other witnesses present at the time of interrogation) that defendant confessed to him that he intended to kill deceased when he returned to the house did not weigh heavily with the jury and was not responsible for the conviction of murder in the first degree. The alleged confession to Sayers took place within two hours after the shooting. Defendant was then in a critical condition and, according to Sayers' testimony, in response to a question propounded by Sayers stated that he had no hope of recovery and believed he was going to die.

The belief that " a dying man is ever presumed to speak the truth " is ancient (see 5 Wigmore on Evidence, § 1430, p. 219 *et seq.*). As Wigmore says (§ 1438, p. 230): " All Courts have agreed, with more or less difference of language, that the *approach of death* produces a state of mind in which the utterances of the dying person are to be taken as free from all ordinary motives to mis-state. The great dramatist [Shakespeare] expressed the common feeling long before it was sanctioned by judicial opinion." (*King John,* act V, scene 4.) A classical statement of the principle is found in *Woodcock's Case* (Leach Cr. L. [4th ed.], 500 [1789]): " The general principle on which this species of evidence [dying declarations] is admitted is that they are declarations made in extremity, when the party is at the point of death and when every hope of this world is gone; when every motive to falsehood is silenced, and the mind is induced by the most powerful considerations to speak the truth; a situation so solemn and so awful is considered by the law as creating an obligation equal to that which is created by a positive oath administered in a court of justice ". Did that ancient and common feeling enter into the jury's thinking when it considered Sayers' testimony that defendant, without hope of recovery, confessed to him that when he returned he intended to kill Mrs. Frank? That, we can never know.

It may be that an inspection of the memorandum would not have assisted defendant in any way. But, as was said in *Tibbetts* v. *Sternberg* (66 Barb. 201, 203, *supra*): " The production of the paper might have been of no value to the defendant, but it is the principle thus sought to be established that is mischievous and dangerous. The right of a party to protection

against the introduction against him of false, forged or manufactured evidence, which he is not permitted to inspect, must not be invaded a hair's breadth. It is too valuable to be trifled with, or to permit the court to enter into any calculation as to how far it may be encroached upon without injury to the party ". Or, as was written in *Schwickert* v. *Levin* (76 App. Div. 373, 375, *supra*): " The defendant had the right to see, and to use on cross-examination, any memorandum or writing which had served to refresh the memory of the witness on his direct examination. * * * As the conversation was material, the defendant might possibly have been prejudiced by this limitation upon his cross-examination, and, therefore, I think that a new trial should be ordered."

The trial court committed another serious error which warrants discussion.

About six hours after the case was submitted to the jury, the jurors returned into court seeking further instructions. Counsel have stipulated that, when the questions were submitted to the court, the court called counsel into chambers and instructed them " that they were not to utter a word or make any statement whatsoever in open Court in the presence of the Jury and that neither could take an exception, or make any requests, at that time but were instructed that any words, statements or exceptions and requests, if any, were to be made to the Stenographer on the record after the Jury had been retired from the Court Room to continue with its deliberations."

The jury asked the following two questions: " Classification of the Penal Law pertaining to the use of firearms in the case of first or second degree murder; also classification of first and second degree murder."

The court answered as follows: " Mr. Foreman and ladies and gentlemen of the jury: Section 1044 of the Penal Law of the State of New York entitled ' Murder, first degree, defined:' reads as follows: ' The killing of a human being, unless it is excusable or justifiable, is murder in the first degree when committed from a deliberate and premeditated design to effect the death of the person killed or another.' Section 1046 of the Penal Law of the State of New York entitled ' Murder, second degree, defined:' reads as follows: ' Such killing of a human

being is murder in the second degree when committed with a design to effect the death of the person killed or of another, but without deliberation and premeditation.' "

The jury then retired to the juryroom. Both counsel, on the oral argument in this court, stated that following those instructions the Judge returned to his chambers. Defense counsel argued further that in departing to chambers the Judge refused to give attention to counsel's wish to register an exception to the charge. No exception was in fact noted on the record. Within twenty-eight minutes after the jury had returned to its deliberations, it brought in a verdict of guilty of murder in the first degree.

It is the defendant's position that the jury was apparently confused as to the effect of the use of a firearm in the slaying, as bearing on the element of premeditation or as bearing on the degree of murder and that the court failed to answer the question asked by the jury relating thereto and returned them to the juryroom without having attempted to dispel the confusion in their minds. The prosecution maintains that there was no intimation in the question which the jury asked the court that any juror entertained any confusion of mind or doubt concerning the law which governed premeditation and deliberation.

The questions — and it is clear that there were two — are, perhaps, not framed in the clearest of terms. It is, nevertheless, evident against the background of the evidence in the case that the jurors were desirous of knowing what weight they were to attribute, in determining whether defendant was guilty of murder in the first or second degrees, to the fact that defendant was armed when he entered the Frank home for the second time. The use of a firearm by him clearly troubled the jurymen or one or some of them. In the main charge the Judge had defined premeditation, deliberation, and design to effect death, but he did not discuss whether the jury was bound as a matter of law to presume that defendant killed deceased with a premeditated and deliberate design to effect her death from the fact that he went to her home armed with a revolver or whether any such conclusion was to be an inference of fact only. The jury in its second question asked for a " classification of first and second degree murder." The Judge in answer to the two

questions simply read to the jury the definitions of murder in the first and second degrees as found in the Penal Law (§§ 1044, 1046). That is, he answered the second question only, ignoring the first question relating to firearms. It is settled law that a judge may not decline to answer a jury's request for further instructions (Code Crim. Pro., § 427; *People* v. *Gonzalez,* 293 N. Y. 259; *People* v. *Cooke,* 292 N. Y. 185). Of course, it is not the law that any failure by a court categorically to answer any question propounded by a jury constitutes reversible error. But, it is the law as stated in *People* v. *Gonzalez (supra,* p. 262): " that if to a proper question the court gives no answer at all or an answer that fails to answer, then the error is reversible."

In this case the jury had been deliberating for some six hours when it requested further instructions. An impasse had been reached. The jurymen felt that additional instructions were necessary to dispel a doubt existing in the mind of one or some of them. There can be no question but that the doubt was caused by defendant's possession of a revolver when he returned to the Frank home. Within twenty-eight minutes after they were returned to the juryroom, without having received the instructions sought, they returned to the courtroom with a verdict of guilty of murder in the first degree. It was during those minutes when the jury was left to its own conclusions that defendant's fate was decided adversely to him.

In *People* v. *Gonzalez* (293 N. Y. 259, 263, *supra*) we quoted with approval the following statement from Chief Judge LEHMAN's dissenting opinion in *People* v. *Cooke* (292 N. Y. 185, 193, *supra*): " The court *must* give the information requested, and where the court fails to give information requested upon a vital point no appellate court may disregard the error under section 542 of the Code of Criminal Procedure ".

Here, the information requested pertained to a vital point, viz., whether the jury was to presume or infer premeditation, deliberation or design to effect death from defendant's use or possession of a firearm and it was reversible error for the court not to have instructed the jury thereon.

The prosecution maintains that the jurymen were apparently satisfied with the court's instructions since they did not request further instructions although the court informed them that they could do so. The answer to that argument is found in

the following language from *People* v. *Gonzalez* (*supra,* p. 261):
" Their question, while not framed in language of the utmost possible clarity, was intelligible and, *even if it were not, it was the court's duty to ask the questioners to make their inquiry clearer.* That there was a binding duty to answer the question cannot be doubted." (Emphasis supplied.)

Here, no answer was given to the first question and the Judge did not ask the jury for an explanation of the meaning of that question.

The fact that counsel for defendant did not except to the Judge's failure to instruct is immaterial since in a capital case we have the power to order a new trial in the interest of justice, whether or not an exception shall have been properly taken in the court below (Code Crim. Pro., § 528; *People* v. *Leyra,* 302 N. Y. 353, 365; *People* v. *Nelson,* 189 N. Y. 137).

In view of the foregoing, we find it unnecessary and, therefore, do not determine whether the Judge's instructions to counsel not to speak in the presence of the jury upon its return to the courtroom for further instructions, constitutes, in and of itself, reversible error as a deprivation of the defendant's right to counsel at every stage of the proceedings.

The judgment of conviction should be reversed and a new trial ordered.

LEWIS, Ch. J., DESMOND, DYE, FULD, FROESSEL and VAN VOORHIS, JJ., concur.

Judgment of conviction reversed, etc.