■  THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v GONZALO GONZALES, Appellant.—Appeal by defendant from a judgment of the the Supreme Court, Kings County, rendered September 8, 1976, convicting him of criminal possession of a controlled substance in the first, second and fifth degrees, upon a jury verdict, and imposing sentence. Judgment affirmed. The sole contention on this appeal that merits discussion is defendant's assertion that the Trial Justice committed reversible error when he essentially reread his original charge defining "possession", "constructive possession" and "reasonable doubt" after the jury sought an explanation "in layman's terms" of these concepts. The short answer to this assertion is that no objection was taken to the supplemental charge, and thus the alleged error was not preserved for appeal (see *People v Duncan,* 46 NY2d 74; *People v Gruttola,* 43 NY2d 116). We are not inclined to consider defendant's assertion as an exercise of discretion in the interest of justice in light of the very strong evidence of guilt, which included an admission of guilt by defendant, and overwhelming proof that he exercised control over the apartment where the drugs were found. Among the indicia of this control were rent receipts, defendant's name on the mailbox, testimony that defendant supervised repair work on the apartment, and the presence of defendant's clothing in the closets. Although not necessary for the disposition of this appeal, some comment is warranted as to the merits of defendant's assertion in light of the learned dissent of Mr. Justice Lazer. We are unaware of a per se rule which absolutely bars the rereading of portions of a charge when a jury seeks further instruction, and this case is an outstanding example of why such a rigid stance is undesirable. Mr. Justice Potoker

gave a clear definition and explanation of the terms "possession", "constructive possession" and "reasonable doubt" in his original charge, and he also gave simple and concrete examples of the applicability of these terms to specific facts. A 10-count indictment (two counts of which were dismissed) and a lengthy trial preceded the charge, and of necessity many different concepts were introduced to the jury. The jury deliberated at length, and did not hesitate returning to the courtroom for the rereading of testimony and the study of exhibits. "A court's charge is not like a corporate indenture, able to be studied at leisure" *(People v Lupo,* 305 NY 448, 452). That the jury sought further guidance from Justice Potoker as to the afore-mentioned terms was not necessarily indicative of confusion as to the original definition and explanation of these terms. Rather, the jury, conscientiously seeking to resolve an existing deadlock, may have merely sought a refreshment of the lucid and accurate explantion previously afforded. In light of the clarity of the supplemental charge, which essentially mirrored the initial charge, it is not surprising that no objection was made to the supplemental charge. That the jury convicted defendant of three counts and acquitted him of five others is further indication of their lack of confusion and their ability to grasp the legal concepts presented to them. In short, this is simply not a proper case for a finding that jury confusion existed. Damiani, J. P., Rabin and O'Connor, JJ., concur.

Lazer, J., dissents and votes to reverse the judgment and order a new trial, with the following memorandum: This case sheds some small illumination on the disparity between the judicial conception of comprehensible jury instructions and the reality of juror reaction to such instructions. The need to render jury instructions more understandable to their recipients is a subject of continuing discussion in judicial media (see, e.g., Strawn & Buchanan, Jury Confusion: A Threat to Justice, 59 Judicature 478; Strawn et al., Reaching a Verdict, Step by Step, 60 Judicature 383; Weltner, Why the Jury Doesn't Understand the Judge's Instructions, 18 Judges' Journal, Spring, 1979, Vol. 18, No. 2; Avakian, Let's Learn to Instruct the Jury, 18 Judges' Journal, Summer, 1979, p 40) and is now supported by a number of studies which have probed the basis and extent of noncomprehension in order to provide the drafters of pattern jury instructions with guidelines for revision (see, e.g., Charrow & Charrow, Making Legal Language Understandable: A Psycholinguistic Study of Jury Instructions, 79 Col L Rev 1306; Elwork, Sales and Alfini, Juridic Decisions: In Ignorance of the Law or in Light of It?, 1 Law & Human Behavior 163; Sales, Elword and Alfini, Improving Comprehension for Jury Instructions, 1 Perspectives in Law and Psychology: The Criminal Justice System [B. Sales ed, 1977]; Forston, Sense and Non-sense: Jury Trial Communication, 1975 Brigham Young L Rev 601; Forston, Judge's Instructions: A Quantitative Analysis of Jurors' Listening Comprehension, Today's Speech, Fall, 1970). The current emphasis upon comprehensibility succeeds the original narrower focus upon technical correctness of jury instructions which was intended to reduce an alarming reversal rate (see Nieland, Pattern Jury Instructions: A Critical Look at a Modern Movement to Improve the Jury System, p 2). Here, the trial court made a laudable effort to clarify some of the legal principles it was charging by illustrating them with examples cast toward the understanding of lay jurors. When the failure of this attempt at elucidation was shortly revealed by the jury's request that it be given further explanation "in layman's terms," the court responded by rereading relevant portions of the original charge. The consequence, I believe, must be reversal and a new trial. The defendant was indicted for criminal possession of a controlled substance in

the first degree (two counts), second degree (one count), fifth degree (one count), and seventh degree (two counts); criminal possession of drug paraphernalia in the second degree; criminally possessing a hypodermic instrument; and criminal possession of a weapon in the fourth degree (two counts). A crucial issue at the trial was defendant's relationship to the apartment where both he and the narcotics were seized—the People claimed he was the tenant and he denied it. The arresting officers testified that when taken into custody in the apartment the defendant was in close proximity to the illegal drugs, shirtless and shoeless, and that he then proceeded to take clothing from a closet in the apartment. The rental agent for the building, Laura Davis, told the court that she had collected rent from the defendant; her brother-in-law, who did maintenance work in the building, testified that the defendant had given him instructions concerning required repairs. The defendant asserted that he was a junkie and explained that his presence in the apartment was as a drug purchaser seeking to satisfy his own narcotics habit. He denied renting the apartment and surmised that Miss Davis had a business and romantic relationship with an individual named Irving Cortez, who he claimed was the tenant, and that she was framing defendant to protect Cortez. On cross-examination, Miss Davis was shown a letter she sent to defendant's mother which told of defendant's arrest "in an apartment that belonged to his friend, as the owner of the apartment disappeared and has not been found." The court's lengthy charge included explanations of possible theories of possession which could be applied in determining defendant's guilt. Actual physical possession was illustrated by a demonstration that holding a pen was "physical possession" while putting it down "I am no longer in physical contact with it." Constructive possession was illustrated as follows: "About two or three feet to my left is a water pitcher. It is surrounded by a low railing and can fairly be said to be resting on the Judge's desk or bench. Now, I have not touched it in the last few minutes, and I tell you I do not own it. It is the property of the State of New York. You may have seen various people, attorneys, court officers, who came up and asked me if they could have some water, and you may have seen me nod my head affirmatively or heard me say, 'yes.' From these facts you could find that I had dominion and control over the water pitcher; that is, that I had constructive possession. In that example I spoke of an object within my reach and sight. But dominion and control need not necessarily require that it be within sight or reach. For example, if I have here in my pocket a key to a safe deposit box in a bank in Brooklyn, you could find that I had dominion and control over the contents of that box. A number of common threads run through these examples. One is the ability to control the item, and the other is the intention of the person who has that ability to control the item. For example, if an item of property was lying at my feet, while you might find that I had the ability to possess or control it, you would still have to find from the facts and circumstances that I had the intention to possess or control it. * * * Constructive possession may be proved in various ways. For example, People may prove that the defendant knowingly possessed a narcotic drug by his own admission, or it may be inferred from his conduct. It is for you, the triers of the facts, in light of all the testimony in the case, to determine whether the fact of defendant's knowing possession was proved beyond a reasonable doubt. Inditia [sic] of control would also include the fact that defendant exercised such dominion over the apartment, as to have the power to limit or bar ingress or egress of others, the regularity or constancy of his visits, ready access to the apartment, or key possession, provided of course that such fact or facts have been

proven beyond a reasonable doubt." Reasonable doubt received the following explanation: "THE COURT: Now, you have heard me say that the defendant's guilt must be established by the People beyond a reasonable doubt. Now, what do the words 'reasonable doubt' mean? They mean exactly what they imply, a doubt based upon reason. They do not mean that the People must prove the defendant's guilt beyond all doubt, but beyond a reasonable doubt, as I shall attempt to further define it to you. They mean the reasonable doubt of a reasonable man or woman. They do not include mere possibility or whim or a doubt born of guess or one of surmise or one of fancy, but rather a doubt which arises from the conscientious consideration of all the evidence. Such a doubt is often defined as an actual doubt, of which you are conscious after you have gone over all the testimony in the case and have given consideration to each and every part of the evidence. When after such consideration the presence of certain facts or the absence of certain facts in the proof leaves your mind in a state of uncertainty so that you are not fully convinced of the defendant's guilt, and within the state of mind you have a doubt which seems reasonable to you, that sort of a doubt is a reasonable doubt. When such a doubt exists you must give the benefit of that doubt to the defendant and acquit him. On the other hand, if no such reasonable doubt exists, it is equally your duty to convict the defendant. The law makes no distinction between the degree of importance of the duty of the jury in one instance to acquit if the reasonable doubt exists and the other instance to convict where no doubt exists." These pertinent portions of the trial court's charge have been reproduced in full because they are demonstrative of language, and perhaps concepts, which confounded a jury of laymen sufficiently to cause a request for enlightenment through the use of simpler terms. In any event, after a two-day period of deliberation, during which the jury returned on several occasions to request that portions of the testimony be reread and that it be permitted to examine the items marked in evidence, the court received a note from the foreman stating: "We the jury find it impossible to reach a unanimous verdict and are deadlocked in this case." Exhorted by further instructions to resume their efforts to reach a verdict, the jurors returned to their quarters for further deliberation. About three hours later, the jury sent another note which read: "We the jury request the following: explain to the jury *in layman's terms* the definitions of 'possession, constructive possession,' and 'reasonable doubt' as applied to the law in this case" (emphasis supplied). The court then proceeded to reread its original charge on these subjects essentially in verbatim form. Less than 45 minutes later, the jury was back in the courtroom with verdicts of guilty on the three counts of the indictment charging defendant with criminal possession of a controlled substance in the first, second, and fifth degrees (cocaine, heroin, and marihuana), and not guilty verdicts on the remainder of the counts submitted. My colleagues have concluded that affirmance is required. I disagree. In three murder cases in the early 1940's, the Court of Appeals dealt with the trial court's obligations to explain instructions in response to jury requests. *People v Flynn* (290 NY 220, 224) reversed a first degree murder conviction because of the Trial Judge's refusal to answer a juror's inquiry as to whether premeditation to commit the earlier attempted robbery would infer responsibility for a resulting death where the indictment charged common-law murder. The trial court's recondite last word to the jury—"This is a common law murder case as I have defined murder to you" *(People v Flynn, supra,* p 224)—was held clearly ineffective to elucidate the concepts of premeditation with which the jury was patently struggling. *People v Cooke* (292 NY 185) is more signifi-

cant for its dissent than for its holding. The trial court had correctly defined the intent element of first degree murder and first degree manslaughter, and when the jury asked that the charges concerning murder and manslaughter be repeated "with particular emphasis" on "intent," the court repeated its original charge. The jury subsequently returned with the following request (p 188): " 'Your Honor: In your charge, did you state it was a point of law, that if a premeditated act to cause serious injury but not necessarily to cause actual death, but which, however, results in actual death, that this premeditated act is the intent to kill? 'We would appreciate your reading the parts of your charge dealing with "intent" relative to the act.' " Although the Trial Judge replied that he did not understand the first part of the question, he responded to the second part and added certain illustrations in the hope that it would answer the first question as well. The majority affirmed the resulting convictions, holding that while the illustrations were either inapt or too apt for comfort, the charge on intent, given three times, "was not incorrect in substance or in any important part thereof" *(People v Cooke,* 292 NY 185, 190, *supra).* Chief Judge Lehman's dissent (joined by two colleagues) presaged current law (pp 193-194): "The fact remains that *after* hearing the charge delivered twice the jurors asked further information. There is no reason to believe that delivery of the charge a third time removed any confusion or misunderstanding left after the charge had been delivered twice * * * It is indisputable that in reply to the question propounded by the jurors the Trial Judge gave no instruction which he had not given before and which might even by implication answer the question asked by the jury or remove the doubt which still remained in the minds of the jurors or some of them. That was error which this court may not disregard." In the final case of this trio, *People v Gonzalez* (293 NY 259), the Court of Appeals adopted the presently prevailing view relevant to rereading in response to a plea for clarification. The *Gonzalez* Trial Judge had replied to a juror's question concerning premeditation by telling the jury (p 261) that he was unable to answer the question in the form put "except as already given in my original charge. If you care to have any portion of such charge read, indicate it and I will have it read." The jury made no indication, the charge was not reread, and conviction followed two and one-half hours later. Quoting the language of the Pennsylvania Supreme Court in *Commonwealth v Smith* (221 Pa 552, 555), the Court of Appeals declared (pp 262-263): " 'The very fact that the jury, after having been in consultation, have failed to comprehend the instructions given in the charge and request further instructions, is of itself sufficient to show the necessity of additional instructions * * * [I]f the jury do not understand the instructions, or are ignorant or uncertain as to the law applicable to any part of the case, the charge is inadequate and fails of its purpose, which is to advise the jury fully and clearly upon the law applicable to each and every part of the case.' That clear statement disposes of the contention made in the present case that the court dealt adequately with the submitted question when he offered to read to the jury any desired part of his original charge." The court then proceeded to agree with Chief Judge Lehman's admonition in *Cooke (supra),* that failure to provide the requested information on a "vital point" could not be disregarded by an appellate court. Fifteen years later, in *People v Miller* (6 NY2d 152), the court restated the principle of the earlier *Gonzalez* determination, but noted that reversal was not mandated in the absence of "serious prejudice." Miller's conviction was reversed because the trial court reacted to jury interrogatories by offering to repeat its original charge concerning the crimes in question. The Court of

Appeals majority asserted (p 156) that "a mere offer to reread the principal charge—although it was correct—would be of little help to a perplexed jury. If the jurors did not comprehend the original charge—and have asked for further instructions—it is unlikely that they would glean the resolution of their doubts as to the applicable law from a reiteration of that very same charge". The fundamental rule emerging from these cases—that the court has a concrete duty to clarify the law upon a proper jury request for information and that mere repetition certainly will not do—subsequently has been impressed upon the trial Bench in numerous instances (see, e.g., *People v Jackson,* 20 NY2d 440, cert den 391 US 928; *People v Gezzo,* 307 NY 385; *People v Lupo,* 305 NY 448; *People v Brabham,* 77 AD2d 626; *People v Lopez,* 73 AD2d 676; *People v Massamillo,* 69 AD2d 790; *People v Valerio,* 64 AD2d 516; *People v Rich,* 57 AD2d 820; *People v Botteri,* 50 AD2d 540; *People v Conigliaro,* 20 AD2d 930). Reversal must be the consequence if the trial court's total failure or inadequate reponse to a legitimate query from the jury spawns serious prejudice to the defendant's rights (see *People v Jackson, supra; People v Miller, supra; People v Gezzo, supra; People v Gonzalez, supra).* I differ with my colleagues' conclusion that the charges in issue are clear. If, as current jocular wisdom has it, charges are for the Appellate Division, they are clear enough. But the best and most vital arbiters of whether a charge is comprehensible to a jury are the jurors themselves. Therefore, I cannot gainsay this jury's judgment that clarification in what they referred to as layman's terms was required. Until current studies in the area of juror comprehension are much further advanced, evaluations as to comprehensibility by members of the Bench and Bar will continue to suffer from the general lack of knowledge of what terminology, syntax and concepts create difficulties for jurors. Thus, I would hesitate to point at the specific portions of the charges which strike me as being arcane to lay jurors. Their request must be deemed sufficient. In reaching my determination that reversal is required, I am moved by the fact that the same jury which sought an explanation of the meaning of "possession", "constructive possession" and "reasonable doubt" in "layman's terms" found the defendant guilty of possession beyond a reasonable doubt without receiving the explanation sought. Since the evidence was conflicting—indeed, it had deadlocked the jury just a short time before—I must conclude that the failure to explain was prejudicial to defendant's right to a fair trial and that it did not constitute harmless error beyond a reasonable doubt. Accordingly, I vote for reversal and a new trial.